# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1264

_____

| | | |
|---|---|---|
| Bruce Roemmich, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of North Dakota. |
| Eagle Eye Development, LLC; | * | |
| Leland Bertsch; Jane Bertsch; and | * | |
| Jon Wagner, | * | |
| | * | |
| Defendants-Appellees. | * | |

_____

Submitted: November 16, 2007
Filed: May 13, 2008

_____

Before RILEY, TASHIMA,[1] and SMITH, Circuit Judges.

_____

TASHIMA, Circuit Judge.

Plaintiff Bruce Roemmich brought an action against defendants Eagle Eye Development, LLC ("Eagle Eye"), Leland Bertsch, Jane Bertsch, and Jon Wagner, alleging various violations of his rights as an Eagle Eye minority shareholder. He

_____

[1]The Honorable A. Wallace Tashima, United States Circuit Judge for the Ninth Circuit, sitting by designation.

now appeals the district court's[2] partial grant of summary judgment in favor of the defendants on their statute of limitations defense, as well as the district court's[3] resolution of most of the issues against him following a bench trial. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I. *Background*

In early 1995, Leland and Jane Bertsch, husband and wife, began to bid on projects to construct and lease three post office buildings to the United States Postal Service ("USPS"), one in Minnesota and the other two in Cocoa Beach and Mims, Florida. During the Spring of 1995, after Leland secured the bids on the Florida projects, the Bertschs and Jane's brother, Roemmich, agreed that Roemmich would oversee the construction and development of the Florida projects in exchange for a 30 percent ownership interest in those projects, as well as a $400 per week salary.

The Bertschs formed Eagle Eye on June 12, 1995. According to the Member Control Agreement signed on that date, Leland made a 95 percent capital contribution and therefore retained a 95 percent financial and voting interest. Jane made the remaining contribution and retained a 5 percent financial and voting interest in Eagle Eye. Shortly thereafter, on June 28, 1995, Jane assigned her interest in Eagle Eye to Roemmich. Leland also conveyed a 25 percent ownership interest to Roemmich "for value added," namely, the current and future performance of his job duties, resulting in 70 percent ownership by Leland and 30 percent ownership by Roemmich. Roemmich also became a Secretary, Treasurer, and Governor of Eagle Eye. Later that

---

[2]The Honorable Daniel L. Hovland, Chief United States District Judge for the District of North Dakota.

[3]The Honorable Charles S. Miller, Jr., United States Magistrate Judge for the District of North Dakota.

year, the parties agreed to name Wagner as Secretary of Eagle Eye in place of Roemmich.

Around this time, Roemmich was aware that Eagle Eye planned to rely on another of the Bertschs' companies, Bertsch Construction, Inc. ("Bertsch Construction") to provide support services including accounting, secretarial support, and office space and equipment. Further, although it is undisputed that Leland told Roemmich that he had made arrangements for interim financing, Leland never represented that he would cover costs beyond what was originally contemplated as being necessary for financing the projects. Financing became an issue for the Cocoa Beach project when the city refused to approve initial plans submitted by the USPS, resulting in project delays and change orders that drove up the cost. As a result, the Berstchs and Roemmich secured additional financing through personal loans, which were eventually satisfied. These financial difficulties contributed to Roemmich's decision to leave the Florida projects in June of 1996.

When Roemmich left Florida, physical construction of the Mims site was virtually complete, and the USPS was scheduled to conduct a walk-through inspection the following week. The Cocoa Beach project was about a month behind the Mims project, and required further construction, resolution of claims with contractors, preparation and negotiation of change orders with the USPS, and amendment of the lease agreement. After Roemmich left, Leland hired Donald Haynes, the contractor of record for both the Mims and Cocoa Beach projects, to complete Roemmich's tasks.

Although relations between Roemmich and the other officers of Eagle Eye had already begun to decline prior to Roemmich's decision to leave Florida, they dropped precipitously after that point. During a June 12, 1996, meeting, Roemmich became upset with Wagner and physically and verbally threatened him. After the June 12 meeting, Leland scheduled a special meeting of the members, board of governors,

and officers of Eagle Eye concerning the removal and election of governors and officers. That meeting was held on June 24, 1996. Because Roemmich did not attend the meeting in person, or through his attorney, Leland was the only member in attendance. As a 70 percent shareholder, he removed Roemmich as Governor, and appointed Jane as Roemmich's replacement. The Bertschs, in their capacity as Governors, then removed Roemmich as Treasurer, although Roemmich remained the Executive Vice President and retained his ownership interest in Eagle Eye.

Throughout the remainder of 1996, Roemmich received Eagle Eye's financial statements. In late November 1996, Roemmich began expressing his view that Leland and Eagle Eye were committing fraud, tax violations, and other criminal conduct. Roemmich contacted Eagle Eye's bank, suggesting that litigation would be imminent if the bank did not place a freeze on Eagle Eye's accounts and only allow withdrawals accompanied by his signature. The acrimony carried over to an annual meeting held on May 17, 1997. At that meeting, Roemmich had the opportunity to inspect the 1995 and 1996 financial reports, review mortgage and lease information concerning the post office properties, and ask about certain payables and compensation to Leland. The parties again squabbled over Roemmich's threatened legal challenges.

Although Roemmich was provided with notice of a February 23, 1998, annual meeting, he did not attend. Thereafter, the string of meetings came to a stop, and Eagle Eye's documentation of corporate decisionmaking grew sparse. The February 23, 1998, meeting was the last members' meeting held, and there has not been a formal meeting of the board of governors since March 1999. Aside from repairs occasioned by hurricanes in 2004, the primary activity of Eagle Eye after 1999 has been to collect rents, pay bills, file tax returns, and perform necessary maintenance and repairs. Moreover, starting in 1999, at Leland's instruction, Wagner stopped forwarding any financial information to Roemmich, except for Schedule K-1 tax information forms. Although Roemmich has the right to request regular and special

member meetings under Eagle Eye's Operating Agreement, he has never exercised it. Similarly, since 1999, he has not requested detailed financial information.

In the meantime, several events occurred that anchor Roemmich's claims of self-dealing against defendants. In April 1997, Eagle Eye received $152,247.35 from the USPS as part of the renegotiation of the Cocoa Beach lease agreement. Most of the money was paid to Bertsch Construction as reimbursement for various expenses, and Roemmich learned about that disbursement at the May 17, 1997, annual meeting. Bertsch Construction also charged Eagle Eye approximately 3 percent of project costs to provide support services including accounting and secretarial support. Although there is no evidence that the 3 percent management fee was formally approved by Eagle Eye's board of governors or members, Roemmich knew of this expenditure by the May 17, 1997, meeting. Sometime after Roemmich was removed as Governor, Leland instructed Wagner to retroactively compensate him (Leland) for his services beginning in April 1995, at the rate of $400 a week. These payments ended in April 1997, and totaled $41,600. Roemmich asked about these payments to Leland at the May 17, 1997, meeting, and therefore had notice of them. Eagle Eye also hired Bertsch Construction to do repair work on the Florida project caused by hurricanes that hit the state in 2004, at a rate of a 10 percent markup for profit and 10 percent for overhead expenses. Finally, the Eagle Eye made payments on behalf of the Bertschs for non-Eagle Eye expenses, although these payments were always credited against payables owed to the Bertschs.

Based on this conduct, Roemmich filed suit against defendants on April 13, 2004, claiming that their actions were unfairly prejudicial, breached fiduciary duties and a duty to act in good faith owed to Roemmich in his capacity as a member and minority shareholder, and denied his right to vote as a member of Eagle Eye. Roemmich sought damages, dissenter's rights, equitable remedies including a buy-out of his share of the LLC, and costs and attorney's fees. Defendants brought a counterclaim based on Roemmich's decision to leave the Florida projects.

Considering the parties' cross-motions for summary judgment, the district court held that North Dakota's six-year statute of limitations for tort, contract, and statutory causes of action barred Roemmich's claims accruing prior to April 13, 1998, as well as defendants' counterclaim. It also allowed Roemmich's suit against defendants in their individual capacity to go forward. *See Roemmich v. Eagle Eye Dev., LLC*, 386 F. Supp. 2d 1089 (D.N.D. 2005). The parties stipulated to a bench trial, which resulted in dismissal of most of Roemmich's claims. *See Roemmich v. Eagle Eye Dev., LLC*, 2006 WL 2433410 (D.N.D. 2006); 2006 WL 2620373 (D.N.D. 2006). The district court later awarded attorney's fees to defendants, *see Roemmich v. Eagle Eye Dev., LLC*, 2006 WL 3833433 (D.N.D. 2006), a decision which Roemmich also appeals.

## II. *Discussion*

The district court had jurisdiction based on the complete diversity of the parties. *See* 28 U.S.C. § 1332. "In diversity cases, we apply the substantive law of the state in which the district court sits." *Gen. Elec. Capital Corp. v. Union Planters Bank, NA*, 409 F.3d 1049, 1053 (8th Cir. 2005). We therefore look to North Dakota law to resolve Roemmich's claims, and review *de novo* the district court's interpretation of state law. *See id.*

## A. Statute of Limitations

We review *de novo* the district court's grant of partial summary judgment in favor of the defendants on the issue whether Roemmich's claims accruing prior to April 13, 1998, were barred by the statute of limitations. *See Angelo Iafrate Constr., LLC v. Potashnick Constr., Inc.*, 370 F.3d 715, 719 (8th Cir. 2004). Summary judgment is only warranted if the evidence, construed in the light most favorable to the non-moving party, establishes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *See Gen. Elec. Capital*, 409 F.3d at 1053.

Roemmich contends that the district court erred in treating defendants' allegedly wrongful conduct as a series of discrete acts, rather than as a continuing violation. Because some of the conduct occurred after April 13, 1998, he argues that none of it is time-barred. He argues in the alternative that defendants' conduct amounted to a shareholder freeze-out and, as such, falls under the ten-year statute of limitations applicable to claims of relief otherwise not provided for in North Dakota's statute of limitations chapter. *See* N.D. Cent. Code § 28-01-22. We disagree with both contentions.

We must first identify the appropriate statute of limitations for the causes of action Roemmich pleads, and then, if necessary, determine whether the underlying acts complained of constitute a continuing wrong, thus tolling the statute of limitations as to those acts that would otherwise be time-barred. Although Roemmich variously describes his action as one for breach of fiduciary duty or freeze-out, the North Dakota Supreme Court has suggested that they are essentially the same. *See Schumacher v. Schumacher*, 469 N.W.2d 793, 797 (N.D. 1991) (noting that "[a]lthough [the plaintiffs'] action is premised upon numerous theories of recovery, including claims of breach of contract, fraud, deceit, and negligence, the gravamen of their action is breach of fiduciary duty by a majority or controlling shareholder of a closely held corporation"); *Balvik v. Sylvester*, 411 N.W.2d 383, 387 (N.D. 1987) ("Because of the predicament in which minority shareholders in a close corporation are placed by a 'freeze out' situation, courts have analyzed alleged 'oppressive' conduct by those in control in terms of 'fiduciary duties' owed by the majority shareholders to the minority . . . .").[4]

---

[4]The North Dakota Limited Liability Company Act, N.D. Cent. Code §§ 10-32-01–156, imposes a duty to act in good faith on members, *see id.* § 10-32-69, governors, *see id.* § 10-32-86, and managers, *see id.* § 10-32-96. Further, it empowers the court to fashion equitable remedies when "[t]he governors or those in control of the limited liability company have acted fraudulently, illegally, or in a manner unfairly
(continued...)

The North Dakota Limited Liability Company Act (the "Act") does not establish a limitations period for claims arising thereunder, and, to our knowledge, no reported North Dakota case has yet determined the appropriate statute of limitations to apply to a breach of fiduciary duty claim arising under the Act. For the reasons that follow, we conclude that the district court correctly applied the six-year limitations period laid out in Title 28 of the Century Code, *see* N.D. Cent. Code § 28-01-16, rather than the ten-year provision. *See* § 28-01-22. First, an action for breach of fiduciary duty falls within the plain language of § 28-01-16. That provision requires the following actions to be commenced within six years after the claim for relief has accrued:

> . . .
> 2. An action upon a liability created by statute, other than a penalty or forfeiture, when not otherwise expressly provided.
> . . .
> 5. An action for criminal conversation or for any other injury to the person or rights of another not arising upon contract, when not otherwise expressly provided.

N.D. Cent. Code § 28-01-16.

Roemmich's breach of fiduciary duty claim appears to fall within both of these provisions. He grounds his breach of fiduciary duty claim in the provisions of the Act creating both the duty of good faith on the part of defendants, as well as the equitable remedies he seeks. *See* N.D. Cent. Code § 10-32-119. Further, the Act does not expressly provide a separate statute of limitations to govern claims arising thereunder.

---

[4](...continued)
prejudicial toward one or more members . . . ." *Id.* §§ 10-32-119(1)(b)(2), (4). The North Dakota Supreme Court has previously interpreted similar language in the North Dakota Business Corporation Act as creating an action for breach of fiduciary duty. *See Brandt v. Somerville*, 692 N.W.2d 144, 149 (N.D. 2005).

Therefore, his claim meets the requirements of subsection (2) above.[5] *See Brandt*, 692 N.W.2d at 149 (grounding an action for a freeze-out in the Business Corporation Act); *Balvik*, 411 N.W.2d at 388 (tracing the action for freeze-out or breach of fiduciary duty to a prior version of the Business Corporation Act proscribing "oppressive" conduct).

An action for breach of fiduciary duty also falls within subsection (5), because it involves an alleged injury to Roemmich not arising from contract, and also not provided for in the alternative by any other provision. Although there is no North Dakota case on point, the Missouri Supreme Court interpreted a similar provision to encompass breach of fiduciary duty claims. *See Creative Mktg. Assocs. v. AT & T*, 476 F.3d 536, 539 (8th Cir. 2007) (citing Mo. Rev. Stat. § 516.120(4), and *Klemme v. Best*, 941 S.W.2d 493, 497 (Mo. 1997)). Our interpretation is bolstered by the fact that breaches of fiduciary duty are sometimes conceptualized as sounding in tort. *See, e.g.*, Restatement (Second) of Torts § 897 & cmt. b (1979) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act."); *Houle v. Low*, 556 N.E.2d 51, 53 (Mass. 1990) ("[C]orporate 'freeze out' is a tort claim . . . ."). And Roemmich primarily argues that the actions of defendants constituted a continuing tort for the purpose of the statute of limitations. Therefore, we conclude that the district court properly applied the six-year statute of limitations to Roemmich's claims. Concomitantly, we conclude that § 28-01-22, providing a ten-year limitations period for "relief not otherwise provided for," is simply inapplicable.

---

[5]The only detailed discussion of this subsection can be found in *Sheets v. Graco, Inc.*, 292 N.W.2d 63 (N.D. 1980), where Justice Sand, specially concurring and dissenting, interpreted the provision to require that the liability be exclusively created by statute, in other words, not available at common law. *Id.* at 69. The parties do not argue this point, and it is doubtful that a cause of action for breach of fiduciary duty existed independent any statutory scheme, because the limited liability company is a relatively recent creation.

We now turn to the question whether the district court should have applied the continuing wrong doctrine to the conduct established by Roemmich at the summary judgment stage. Under North Dakota law, "[t]he statute of limitations for a continuing tort does not begin to run until the tortious acts cease." *Beavers v. Walters*, 537 N.W.2d 647, 650 (N.D. 1995) (citing 54 C.J.S. *Limitations of Actions* § 177 (1987)). A series of wrongs is only continuous for the purposes of this doctrine, however, "when no single incident in a chain of tort[i]ous activity can fairly or realistically be identified as the cause of significant harm." 54 C.J.S. *Limitations of Actions* § 194 (2008). For this reason, the Seventh Circuit has recently observed that instead of continuity, the doctrine really focuses on cumulativeness: "The office of the misnamed doctrine is to allow suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought." *Limestone Dev. Corp. v. Village of Lemont*, 2008 WL 852586, at *3 (7th Cir. Apr. 1, 2008). A paradigmatic example of such a series of violations is workplace sexual harassment, where "[t]he first instance of a coworker's offensive words or actions may be too trivial to count as actionable harassment, but if they continue they may eventually reach that level and then the entire series is actionable." *Id.* In contrast, in cases presenting transactions that are "separate, distinct, and could have been challenged by a plaintiff" when they occurred, we have found that the continuing wrong doctrine does not apply. *Hope v. Klabal*, 457 F.3d 784, 793 (8th Cir. 2006) (finding the doctrine inapplicable under Minnesota law in an action for fraud based on separate sales of multiple paintings spanning the course of many years); *Davies v. West Publ'g Co.*, 622 N.W.2d 836, 841–42 (Minn. Ct. App. 2001) (applying a six-year statute of limitations to breach of fiduciary duty claims based on financial distributions from the same fund occurring over a period beginning in 1967).

Roemmich has failed to point to any case identifying freeze-out, or a series of breaches of fiduciary duties, as a continuing wrong. In fact, several decisions have held the opposite. In *Thorndike v. Thorndike*, 910 A.2d 1224 (N.H. 2006), the New Hampshire Supreme Court considered a freeze-out claim based on conduct taking

place both in and outside of the limitations period. Specifically, the plaintiff contended that in 1995, after his brother gained control of management of the family business, his brother, *inter alia*, added new board members, removed him from his position as director, eliminated his salary, and diluted his voting powers. *Id.* at 1226. Based on these events, he filed suit ten years later, in 2005. *Id.* Applying a three-year statute of limitations to bar his claims, the court rejected his contention that the continuing wrong doctrine applied, even assuming the following wrongs persisted: his brother continued to exclude him from employment; continued to deprive him of a salary; continued to prevent him from participation in the management of the company; and continued to ban him from the premises. *Id.* at 1228. Because all of the ongoing harm resulted from decisions made in 1995, the statute of limitations began to run at that time. *Id.* The Massachusetts Supreme Judicial Court applied the same reasoning in *Houle*. In that case, a minority shareholder in an ophthalmology practice sued his colleagues and the practice itself after they formed a new surgical center and voted to exclude him from sharing in the opportunity. 556 N.E.2d at 52. Considering his allegation that he was frozen out by the other shareholders, the court simply stated that harm to the plaintiff occurred when he was notified of the decision, and, as such, the statute of limitations barred the cause of action. *Id.* at 53.

*Thorndike* and *Houle* do not necessarily settle this matter, however, because myriad wrongful acts may trigger a freeze-out claim, and some could conceivably be continuing wrongs. *Cf. Schumacher*, 469 N.W.2d at 797 (describing various types of majority shareholder tactics falling under the umbrella of a freeze-out). Many of the wrongful acts described by Roemmich occurring prior to April 13, 1998, were separate, distinct, and themselves the cause of significant harm, thus triggering a running of the limitations period[6]: Roemmich's removal as governor in 1996; loans

___

[6]Because the statute of limitations issue was decided on summary judgment, these facts are taken from the record available to the district court when ruling on the cross-motions.

-11-

made to Eagle Eye by the Bertschs at a 10 percent interest rate as of December 31, 1997; execution of an agreement on January 2, 1997, giving Bertsch Construction the right to manage Eagle Eye's affairs at a rate of 10 percent profit; levying of a construction fee of 3 percent of the total project cost in 1997; and payment to Leland of a salary during 1996 and 1997.[7]  In each case, continuing harm to Roemmich's interests was caused by a discrete act that would give rise to a breach of fiduciary duty claim at the time the allegedly wrongful act was committed.

Although it is possible that the district court erred in rejecting the continuing wrong doctrine as applied to Roemmich's claim that defendants engaged in commingling of personal and Eagle Eye funds, we need not reach that question because Roemmich failed to provide any evidence establishing that the conduct occurred after April 13, 1998.[8]  Therefore, the continuing wrong doctrine would not

[7]Roemmich also identifies two other actions that he alleges constitute a continuing violation: (1) he claims that the defendants continually obtained refinancing before and after April 13, 1998, with the goal of using the money to make preferential payments to Bertsch Construction or the Bertschs; and (2) he raised the possibility that Leland improperly used loans for a separate post office project in Hawaii to pay some of Eagle Eye's debt, causing Eagle Eye to owe the Hawaii project up to $20,000 in interest.  Roemmich fails to cite to the record to support the first assertion; thus, he does not show that he raised it as an issue of material fact before the district court.  *See* Fed. R. App. P. 28(a)(9)(A) (requiring the appellant to provide "citations to the . . . parts of the record on which the appellant relies"); *Racicky v. Farmland Indus., Inc.*, 328 F.3d 389, 398 & n.9 (8th Cir. 2003).  As for the second assertion, the citations he provides do not indicate when the event took place, making it impossible for us to review the district court's ruling.

[8]Again, Roemmich's brief suffers from its failure to point to  specific facts in the record that might support his claims.  The most our search discloses is deposition testimony by Wagner that Leland wrote checks from Eagle Eye accounts for his personal expenses.  We cannot conclude that these events took place after the April 13, 1998, cutoff, however, because the only date discussed in this line of questioning

(continued...)

-12-

toll the statute of limitations as to this series of actions. For the foregoing reasons, we conclude that the district court correctly barred recovery based on acts and events occurring before April 13, 1998.

## B. Limitations Period and the Availability of Equitable Relief

Roemmich contends that the district court erred in barring his claims for equitable relief based on actions occurring outside the six-year limitations period, then turning around and considering pre-April 13, 1998, conduct when determining an appropriate remedy under N.D. Cent. Code § 10-32-119. We review these legal issues *de novo*. *See Pritchett v. Cottrell, Inc.*, 512 F.3d 1057, 1062 (8th Cir. 2008).

As to the first part of Roemmich's contention, we agree with the district court that the six-year statute of limitations applies to Roemmich's causes of action, regardless of whether the relief requested is legal or equitable. The North Dakota Supreme Court has previously applied a similar statute of limitations to claims for equitable relief arising out of actions falling within the statute. *See Diocese of Bismarck Trust v. Ramada, Inc.*, 553 N.W.2d 760, 765 (N.D. 1996) (applying a ten-year limitations period for "'an action upon a contract contained in any conveyance [of land]'" to an action seeking reformation of a ground lease). Indeed, "where a legal and equitable remedy exist for the same cause of action, equity will generally follow the limitations statute." *Estate of Nicolas v. Ocean Plaza Condo. Ass'n*, 909 A.2d 1144, 1152–52 (N.J. Super. Ct. App. Div. 2006). To put it simply, parties who sleep

---

[8](...continued)
was 1996. The only reasonable inference to be drawn is that these transactions took place that year.

on their rights cannot resuscitate time-barred causes of action by seeking equitable remedies.[9]

Although the statute of limitations precludes liability based on stale claims, the Act envisions that evidence of conduct from as far back as the beginning of the business relationship might be relevant in fashioning an equitable remedy once liability is established. The Act provides:

> [I]n determining whether to order relief under this section and in determining what particular relief to order, the court shall take into consideration the duty that all members in a closely held limited liability company owe one another to act in an honest, fair, and reasonable manner in the operation of the limited liability company and the reasonable expectations of the members as they exist at the inception and develop during the course of the members' relationship with the limited liability company and with each other.

N.D. Cent. Code § 10-32-119(4). Based on the language of the statute, the district court correctly allowed both parties to present evidence of events occurring prior to

---

[9]Roemmich relies on *Musto v. Vidas*, 658 A.2d 1305 (N.J. Super. Ct. App. Div. 1995), to support his contention that the district court should have considered conduct occurring far before the statute of limitations cut-off. Although the *Musto* court considered evidence dating back over 20 years before the filing of the complaint, it did so to establish the predicate factual issue of whether the parties had an agreement to make unanimous management decisions. *Id.* at 1308–09. The events giving rise to the action, however, occurred during the same month that Musto filed his complaint: the majority shareholders decided at a meeting to remove Musto as a director of the company and adopted new bylaws, both in violation of the unanimity agreement. *See id.* Because Musto filed the lawsuit almost contemporaneously with the harm caused, no statute of limitations dispute arose. To the extent that Roemmich's argument is simply that the district court should consider conduct occurring during the course of the relationship of the parties in fashioning an equitable remedy, we agree, as our ensuing discussion of that point makes clear.

April 13, 1998, for the purpose of crafting a remedy. Roemmich fails to point to any pre-April 13, 1998, evidence that was either admitted for some improper purpose, such as determining liability,[10] or excluded despite its relevance under § 10-32-119.[11] Therefore, the district court did not err in its treatment of pre-April 13, 1998, evidence.

## C. District Court's Findings of Fact and Conclusions of Law

"When the district court conducts a bench trial as it did here, we review the district court's fact finding for clear error, and we review legal conclusions and mixed questions of law and fact de novo." *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 804 (8th Cir. 2008). Under the clearly erroneous standard, "we will overturn a factual finding only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error was made." *Richardson v. Sugg*, 448 F.3d 1046, 1052 (8th Cir. 2006).

Roemmich contends that the district court erred by looking at each alleged violation as a separate act, rather than considering the totality of the conduct and asking whether it constituted a freeze-out. The record, however, does not support

---

[10]Although Roemmich argues that the district court made a substantive determination that Leland and Wagner did not submit fraudulent change orders to the USPS prior to April 13, 1998, even assuming the truth of his observations, we fail to see how this finding of *no* liability harmed him, given that claims based on these change orders were barred by the statute of limitations.

[11]Roemmich contends that the district court improperly excluded evidence that Leland and Wagner submitted fraudulent change orders to the USPS. Such evidence, he argues, would have further established the wrongfulness of defendants' conduct. By implication, defendants' conduct might have justified more favorable relief. However, he fails to cite any instance in the record where the district court prevented him from introducing evidence for this purpose.

Roemmich's characterization of the district court's decision. It is true that the district court made factual findings regarding each instance of misconduct alleged by Roemmich, finding in most instances that the particular acts did not amount to a breach of fiduciary duties. After doing so, however, the district court then considered the totality of defendants', as well as Roemmich's, conduct, in order to determine whether the conduct amounted to a freeze-out of the minority, a breach of fiduciary obligations imposed by the Act, or an unfair deprivation of Roemmich's reasonable expectations. *See Roemmich*, 2006 WL 2433410, at \*27, \*29.

For example, the district court found that Roemmich had no reasonable expectation of continued employment beyond the development of the Florida projects, and that his abandonment of those projects justified the cessation of his salary; he had no reasonable expectation of immediate or regular financial distributions; the Bertschs did not engage in improper self-dealing; and that he never had a reasonable expectation of an equal say in the decisionmaking of Eagle Eye. *Id.* at \*29. Further, the district court found that although there was a mutual understanding that Roemmich would be actively involved in managing Eagle Eye, and that he had a reasonable expectation that he would be provided with Eagle Eye's financial information, his own inequitable conduct justified his removal as governor. *Id.* at \*29-\*30.

The district court's order provides ample indication that the court considered the totality of the conduct. Moreover, we are unaware of case law prohibiting the district court from first ascertaining what happened in given instances before drawing conclusions about their cumulative effect. In fact, the case law suggests that the district court proceeded properly. *See, e.g.*, *Brandt*, 692 N.W.2d at 150–51 (describing a trial court's separate analysis of various claims allegedly giving rise to a general freeze-out action); *Balvik*, 411 N.W.2d at 388 (noting various incidents found by the trial court justifying its conclusion that the defendant's cumulative actions were "oppressive" under a former version of the Business Corporation Act).

-16-

Roemmich also contends that the district court's findings of fact are contrary to the weight of the evidence presented at trial. However, the trial transcripts and exhibits indicate at least some support for every challenged material finding. Because we must give ample regard to the district court's credibility determinations, as well as its choice between two permissible views of the evidence, we hold that the district court's findings of fact were not clearly erroneous. *See Richardson*, 448 F.3d at 1052.

## D. Attorney's Fees and Expenses

Roemmich appeals the district court's decision to award defendants reasonable expenses, including attorney's fees, under § 10-32-119(8) of the Act. The Act provides that "[i]f a court finds that a party to a proceeding brought under this section has acted arbitrarily, vexatiously, or otherwise not in good faith, it may in its discretion award reasonable expenses, including attorney's fees and disbursements, to any of the other parties." N.D. Cent. Code § 10-32-119(8). The district court based its decision on Roemmich's pre-litigation conduct, specifically emphasizing his use of allegations of fraud and illegal conduct against Leland and Wagner as a sword in his dealings with them and Eagle Eye's banks. "We review *de novo* the legal issues related to the award of attorney's fees and costs and review for abuse of discretion the actual award of attorney's fees and costs." *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1036 (8th Cir. 2008) (citation and quotation marks omitted).

North Dakota case law has not yet delineated what types of acts are arbitrary, vexatious, or not otherwise in good faith for purposes of the statute. Roemmich contends that because he prevailed on portions of his claim, and he did not engage in bad faith litigation conduct, he could not have "acted" in bad faith under the statute. Yet, the authorities he cites do not create a per se rule that prevailing on some portion of the claim prevents the district from finding that he acted arbitrarily, vexatiously, or in bad faith. *Bloom v. Northern Pacific Beneficial Association*, for example, involved interpretation of a statute allowing the court to award fees for the refusal of an

-17-

insurance company to provide coverage to an insured if "it appears to the court that such refusal was vexatious and without reasonable cause . . . ." *Bloom v. N. Pac. Beneficial Ass'n*, 193 N.W.2d 244, 253 (N.D. 1971) (citation omitted). The court there held that the defendant's refusal could not have been vexatious where no evidence presented indicated that the defendant acted in bad faith, and the court determined that the defendant correctly denied coverage for certain medical claims. *Id.* In that situation, a finding that the defendant's denial was proper strongly implied that denials of other claims were not made in bad faith. Nowhere does the decision state, however, that good faith denial of some claims would immunize a bad faith denial of others. Further, the language of § 10-32-119(8) does not restrict the scope of actions available for consideration by the trial court to the same extent as the statute in *Bloom*.

*Belfer v. Merling*, 730 A.2d 434 (N.J. Super. Ct. App. Div. 1999), also relied on by Roemmich, is distinguishable because the only bad faith alleged in that case was the bringing of suit itself. *Id.* at 446. That is simply not the case here, where the district court found that Roemmich leveled baseless accusations of fraud and illegality at defendants, and attempted to use those accusations to disrupt Eagle Eye's business relations. Roemmich does not challenge the district court's conclusion that his accusations of fraud and illegal conduct were vexatious or in bad faith. Thus, we cannot say that the district court abused its discretion in determining that the identified conduct fit the definition of "vexatious" that Roemmich provides: "lacking justification and intending to harass." *Bloom*, 193 N.W.2d at 253 (citing *Webster's*

-18-

*Third New International Dictionary*).[12] We therefore affirm the district court's award of attorney's fees and expenses to defendants.

## III. *Conclusion*

Based on the foregoing, we affirm the judgment of the district court.

_____

---

[12]Roemmich does not contend in his opening brief that relief under § 10-32-119(8) is limited to arbitrary, vexatious, or bad faith litigation conduct, nor does he provide any authority that suggests this interpretation of the statute. Therefore, we have no occasion to decide whether the district court erred in basing its award on pre-litigation conduct. *See United States v. McAdory*, 501 F.3d 868, 870 n.3 (8th Cir. 2007) (requiring the appellant to support claims of error with specific reasons, citations to the record, or relevant legal authority); *Am. River Transp. Co., Inc. v. Paragon Marine Servs., Inc.*, 329 F.3d 946, 948 (8th Cir. 2003) (noting that appellants must raise issues in their opening briefs).