# IN THE COURT OF APPEALS OF IOWA

No. 17-0324
Filed June 20, 2018

**WILLIAM VAN HORN and JUNE LINDNER,**
Plaintiffs-Appellants,

**vs.**

**R.H. VAN HORN FARMS, INC., ROBERT H. VAN HORN a/k/a ROBERT VAN HORN a/k/a R.H. VAN HORN and JOHN VAN HORN,**
Defendants-Appellees.

_____

Appeal from the Iowa District Court for Carroll County, Michael D. Huppert, Judge.

Two sibling shareholders in a closely held farm corporation appeal the business specialty court's rejection of their claim of minority-shareholder oppression. **AFFIRMED.**

Thomas D. Hanson and Theodore W. Craig of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellants.

David L. Charles of Crowley Fleck P.L.L.P., Des Moines, and Matthew C. McDermott of Belin McCormick, P.C., Des Moines, for appellees.

Heard by Vogel, P.J., Tabor, J., and Carr, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**TABOR, Judge.**

Siblings William Van Horn and June Linder appeal the district court's ruling in their legal actions against their brother, John Van Horn; their father, Robert Van Horn; and R.H. Van Horn Farms, Inc., (Van Horn Farms) a closely held corporation in which each family member holds shares. In particular, the siblings challenge (1) the court's determination the farm corporation shares are not all voting shares, (2) its application of the five-year statute of limitations, and (3) its conclusion that they did not suffer minority-shareholder oppression. Because corporate formalities dictated maintaining the distinction between voting and non-voting stock, we agree with the denial of declaratory relief on that claim. On the statute-of-limitation issue, we agree with the district court's rejection of the continuing-wrong exception. And on the primary issue of minority-shareholder oppression, we find the siblings' reasonable expectations have not been frustrated by the actions of the controlling shareholders. Accordingly, we affirm.

## I. Facts and Prior Proceedings

Robert (R.H.) and Phyllis Van Horn raised their four children, William, June, John, and Jane[1] near Glidden, Iowa. In the 1950s, the family moved to the country and began to buy nearby parcels of land. In 1977, the Van Horns formed a family farm corporation (Van Horn Farms)[2] and transferred their land and equipment to that entity. The articles of incorporation designated two types of stock—voting and non-voting—and named R.H., Phyllis, William, June, John, and Jane as members of the board of directors. At the first directors' meeting, the board decided the

---

[1] Jane is not a party to this case.
[2] Van Horn Farms operates as a subchapter "S" corporation.

corporate president and farm manager, then R.H., should be required to live on the property to quickly address any business issues. The bylaws reiterated the delineation of stock as voting and non-voting and set the minimum number of directors at three or more. The bylaws also limited stock transfers to direct descendants of R.H. and Phyllis. The beginning balance sheet showed the following issuance of shares to the family-member shareholders:

|  | Class A (Voting) Shares | Class B (Non-Voting) Shares |
|---|---|---|
| R.H. | 260 | 102 |
| Phyllis | 10 | 352 |
| William | 50 | 20 |
| June | 10 | 2 |
| John | 10 | 20 |
| Jane | 10 | 0 |

In addition to Van Horn Farms, the family owned a local bank, First Bank & Trust, where R.H. served as president. The family formed a bank holding company in 1979, and family members exchanged bank stock for shares of the holding company.[3] As time passed, R.H. and Phyllis transferred Van Horn Farm shares to their children in increments small enough to avoid tax liabilities. R.H. served as president and farm manager, maintaining a stock cow herd, while tenant farmers worked the land through share-cropping arrangements.

---

[3] R.H. intended both Van Horn Farms and the bank holding company to serve as vehicles to transfer assets to his children and avoid taxes.

After their respective high-school graduations, William and June entered the Air Force, and John attended college in Oklahoma. Van Horn Farms operated without any major discord among shareholders for several years under the share-cropping agreements. Records of shareholder meetings reveal all shareholders would vote their stocks, though the minutes do not show if all shares were voted or just those entitled to vote.

In 1986, R.H. and Phyllis divorced. John served as his mother's advocate and negotiated the terms of his parents' dissolution stipulation. In the stipulation, R.H. and Phyllis agreed "[a]ll stock in R.H. Farms, Inc. is to be made voting on or prior to December 31, 1986." But no corporate records reflect a change in voting rights, and the articles of incorporation were never amended. R.H. married his second wife Marcella (Sally) in 1987. The next year, R.H. and Phyllis amended their stipulation; the amendment did not refer to the voting rights provision in the original stipulation but did require Phyllis to sell or gift her stocks to either her children or grandchildren. John then purchased his mother's stocks and evenly distributed them among himself, June, and William. As a show of appreciation to R.H. for loaning money to Van Horn Farms, the board of directors granted Sally a life estate to portions of land in 1989.

When their tenant farmer died suddenly in 1990, John returned to Glidden to help with the farming operation. By 1995, John was farming all of Van Horn Farms property as an employee of the corporation rather than as a tenant. As compensation, John received a salary of $21,000 and free housing on the farmstead. A record of the 1995 directors' meeting memorialized Van Horn Farms's decision to borrow just under one million dollars from R.H. The minutes

concluded Van Horn Farms would repay the debt after other outstanding debts but before issuing any dividends. The 1996 minutes showed Van Horn Farms then owed R.H. almost $1.12 million and reiterated no dividends would be paid until the debt was retired.

By 1998 only R.H., William, June, and John retained shares in Van Horn Farms. The minutes reflect each stockholder held 170 shares. Van Horn Farms purchased six parcels of land between 1998 and 2000. The farm corporation also paid around $165,000 for the addition of a trophy room at the house where R.H. liked to display mounted animals from the family's big-game hunting trips. At the beginning of 2000, John sent William and June a letter detailing the financial health of Van Horn Farms through corresponding tax filings. The letter also discussed the bank holding company, stating:

> (1) the Bank will pay a large dividend to the Holding Company; (2) the Holding Company will pay a sizable distribution to us; (3) we will use a bunch of this to pay our 1999 taxes; (4) we will transfer some more to the Farm Corp to make our assorted farmland payments; (5) we will (hopefully) have a bit ($10,000) left over for our personal use.

A record of their cash contributions passing through the holding company were as follows: $300,811.58 from William, $287,613.00 from June, $333,705.00 from John; and $197,900 by R.H. In 2001, R.H. divorced Sally, but she retained her life estate in portions of land held by Van Horn Farms.

Animosity bubbled up among the family members over issues related to the bank holding company during this time frame and spilled into the 2002 meetings of Van Horn Farms. At the January 12, 2002 board of directors' meeting, June and William suggested Van Horn Farms pay Phyllis for the stocks she transferred to John after her divorce from R.H. "During discussion of this issue, the meeting

collapsed into total disarray and broke up." Minutes for the corresponding shareholders' meeting show the stock distribution and specify voting and non-voting shares. At the December 17 shareholder meeting, the roll call of stocks differentiated between voting and non-voting shares over objections by William and June. The bylaws were then amended to reduce the number of directors to two or more; R.H. and John were elected as directors.

Negative feelings continued when R.H. tried to block the sale of the bank holding company in federal court. But after the federal court ruled in favor of William and June, they voted to sell the holding company. Van Horn Farms also bought R.H.'s insurance agency around this time and then sold it back to the agency's employees.

William and June participated in the 2004 shareholders' meeting by telephone and moved to increase the number of directors to four. The motion passed and William and June rejoined the board. John bought out Sally's life estate and sold it back to Van Horn Farms in July 2006 for $290,000. Due to the tension among the shareholders, John offered to buy out William and June for $100,000 each in December 2006—but neither responded to the offer. And at the following shareholder meeting, John proposed Van Horn Farms convert from an "S" corporation to a "C" corporation. But because the change required a majority vote by all shares, regardless of voting status, the proposal failed based on opposition from William and June. John repeated his offer to buy out William and June in 2010; again neither accepted. Also in 2010, John loaned Van Horn Farms $203,000 to remodel the house where he lived in as a benefit of his employment.

Anticipating litigation, the parties entered a series of tolling agreements, the first in 2011. The parties tried settlement negotiations but were unsuccessful. William filed suit against John, R.H., and Van Horn Farms before the tolling agreements expired. June, on the other hand, waited to file suit and missed the tolling agreement's deadline. When June and William moved to consolidate their actions, defendants initially resisted and the court denied consolidation. But the parties eventually agreed to consolidate the actions and consented to participate in the Iowa Business Specialty Court pilot project (business court).

Siblings William and June asked the business court to declare that all of Van Horn Farms's stock was voting stock. The siblings also sought to dissolve and partition the farm corporation—alleging minority-shareholder oppression. At trial, both sides presented expert testimony regarding the accounting methods used by Van Horn Farms and similar corporations. Experts for both sides agreed cash-based accounting is common practice and provides various tax benefits. William and June also presented an expert opinion that had the land been farmed by cash rental, the farm corporation could have reaped greater returns. All four shareholders also testified.

In a detailed, thorough, and well-reasoned ruling, the business court determined the Van Horn Farms shares were never converted to all voting shares. The court also credited Ted Lodden, the accounting expert called by the defendants, and concluded William and June failed to prove minority-shareholder oppression. Siblings William and June appeal.[4]

---

[4] Our supreme court asked us to resolve whether June's appeal was timely. June filed her notice within thirty days of the business court's ruling and the court issued a nunc pro

## II. Scope and Standards of Review

Because this case was tried in equity our overall review is de novo. *See Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 668 (Iowa 2013) (*Baur II*). And though we are not bound by the court's factual findings, "we generally give them weight, especially with regard to the credibility of witnesses." *Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 97 (Iowa 2011). We review statute-of-limitations claims for legal error. *State v. Tipton*, 897 N.W.2d 653, 672 (Iowa 2017).

## III. Analysis

### A.       Classification of Stocks

William and June first challenge the business court's refusal to recognize all Van Horn Farms stock as voting stock. They pin their position on their parents' original 1986 dissolution stipulation, which stated all farm corporation shares would be given voting status. William and June assert because R.H. held the majority of voting shares, at the time of the dissolution, he had the ability to change their voting status. Effectively, they argue because R.H. wielded control over Van Horn Farms, his word functioned as corporate command. They cite *Soults Farms*, 797 N.W.2d at 102, to argue R.H. "had the authority to change all stock to voting stock by himself." But *Soults Farms* cannot be reasonably read for that broad proposition.

*Soults Farms* affirmed a corporate president's ability to bind the corporation either through express authority or implied authority in the normal course of

---

tunc order clarifying that its ruling applied to both William and June. Accordingly, her appeal is properly before our court. *See* Iowa R. App. P. 6.101(1)(b) (requiring appeal be filed within thirty days of entry of final order or judgment); *McVay v. Kenneth E. Montz Implement Co.*, 287 N.W.2d 149, 150 (Iowa 1980) ("A nunc pro tunc entry makes the record show now what was actually done then.").

business. Here, June and William offer no evidence Van Horn Farms gave R.H. express authority to use the voting status of its stock as a bargaining chip while negotiating his dissolution. And because such conduct would fall outside its normal course of business, R.H. did not have the ability to bind Van Horn Farms through implied authority. Even as president and majority shareholder of voting stock, R.H. was not authorized to bind Van Horn Farms to the terms of his dissolution. And even if he did, Phyllis, the other party to the stipulation, would be the proper enforcer of that provision.[5] *See Olney v. Hutt*, 105 N.W.2d 515, 518–19 (Iowa 1960) (noting non-parties to a contract may only bring an action when the contract clearly intends to benefit the third party given the circumstances).

William and June urge that the change in voting status post-dissolution was evidenced in several ways. For instance, they rely on John's filing of an annual report for the bank holding company with the Federal Reserve System. The form requires a bank holding company to disclose other interests of certain members, including ownership of at least twenty-five percent of outstanding voting shares in a corporation. When filing the form for 1999, 2000, 2001, and 2002, John listed each shareholder of Van Horn Farms as holding twenty-five percent of its voting stock. But the form's instructions indicate that in addition to current twenty-five percent voting interests, members should also disclose shares in corporations that may be converted into voting shares. Because directors and shareholders could elect to convert all of Van Horn Farms shares to voting shares by amending the

---

[5] John testified that when he advocated on his mother's behalf for the voting change provision in the dissolution stipulation he did so to protect her interests in Van Horn Farms not for the benefit of any of the other shareholders.

articles of incorporation and bylaws, each member could have a twenty-five percent voting share in the future. John's reporting follows those instructions rather than signaling all stock was voting stock.[6]

William and June also note the long-held practice of permitting all Van Horn Farms shareholders to vote as evidence that all shares enjoyed voting status since the dissolution decree. But all shareholders held at least some voting shares since Van Horn Farms's inception, allowing each shareholder to vote at least ten shares. A review of available shareholder-meeting minutes show that, contrary to the siblings' assertions, the only time all shares—regardless of voting status—were voted was at the February 20, 1996 meeting. Other minutes chronicled the overall shares held by each member without identifying which were voting and non-voting but failed to state how many shares each member voted. By 2002, the minutes specified which shares were voting and non-voting. But John, June, and William all testified that R.H. requested one or two additional shares at the 2002 meeting to break a deadlocked vote—which would only occur if all stock was voting stock. While R.H. may have believed he and John possessed the same number of voting shares as June and William, his belief did not make it so.

Ultimately dispositive of the issue, the Van Horn Farms articles of incorporation and bylaws delineated between voting and non-voting shares. Neither document was amended to reflect the terms of the dissolution stipulation.[7]

---

[6] Even if John intended to declare each member as having an equal proportion of voting shares, it would not matter. As discussed later, the voting status of the shares remained unchanged without amendment to the articles of incorporation and bylaws.

[7] When Van Horn Farms was incorporated, articles of incorporation could be amended under Iowa Code section 496A.55 (1975). Iowa Code chapter 496A was repealed in 1989 and replaced by the Iowa Business Corporation Act, chapter 490. 1989 Iowa Acts ch.

Because R.H. did not have authority to change the voting status of Van Horn Farms stock through his dissolution decree and the corporation never amended its articles of incorporation and bylaws, all shares were not converted to voting shares. The business court correctly ruled on the declaratory judgment.

### B. Minority-Shareholder Oppression

### 1. Tolling Agreements and Statute of Limitations

While trying to resolve their disagreements out of court, the parties entered into a series of tolling agreements. The agreements permitted William and June to file a complaint by November 30, 2013, and rely on any conduct occurring on or after April 14, 2006.[8] William filed his complaint on November 27, 2013. On November 30, when the agreement was set to expire, June entered into another tolling agreement permitting her to file a complaint by May 31, 2014. Yet she did not file her complaint until December 2, 2015. As a result, her claims may only rely on conduct occurring within the five-year statute of limitations from the time of filing (dating back to December 2, 2010). But because the success of William's claim would necessarily impact June, as another shareholder, and provide both with relief, we will consider conduct dating back to April 14, 2006.

To reach conduct before that date, William and June argue the continuing-wrong doctrine prevents the application of the statute of limitations to their claims. The continuing-wrong doctrine applies "where the wrongful act is continuous or repeated, so that separate and successive actions for damages arise, [and] the

---

288. When William and June filed their petitions, Iowa Code section 490.1001 (2013) permitted articles of incorporation to be amended.

[8] In accordance with the tolling agreements, the statute of limitations reaches back from April 14, 2011. The statute of limitations is five years. *See* Iowa Code § 614.1(4) (2013).

statute of limitations runs as to these latter actions at the date of their accrual, not from the date of the first wrong in the series." *Hegg v. Hawkeye Tri-County REC*, 512 N.W.2d 558 (Iowa 1994) (citing *Anderson v. Yearous*, 249 N.W.2d 855, 860 (Iowa 1977)). And the doctrine limits recovery "to those actions accruing during the statutory period." *Id.*

Careful review of *Hegg* clarifies the doctrine kicks in only when the same wrongful act recurs in separate and successive actions.[9] *See id.* (using phrase "the wrongful act" indicating a specific wrongful act rather than wrongful acts generally). Accordingly, the siblings' reliance on the continuing wrong doctrine is misplaced.[10] And their reliance on *Baur I* is fruitless. The instant case is distinguishable from *Baur I*. There, we decided the continuing wrong doctrine applied because the majority shareholder repeatedly refused to buy out the minority shareholder absent a minority discount. *See Baur I*, 2010 WL 447063 at *8 (noting majority shareholder's "insistence on a minority discount is a continuing wrong"). By contrast, William and June allege oppression based on a variety of discrete acts that could have been challenged by a plaintiff when they occurred.

---

[9] In *Baur v. Baur Farms, Inc.*, No. 09-0480, 2010 WL 447063, at *7 (Iowa Ct. App. Feb. 10, 2010) (*Baur I*), our court cited *Roemmich v. Eagle Eye Development, L.L.C.*, 526 F.3d 343, 348 (8th Cir. 2008), which concluded separate and distinct acts, actionable in their own right, do not qualify as continuing wrongs. We did not disagree with the reasoning in *Roemmich* but distinguished it on the facts. *Id.* at *8.

[10] They attempt to support their minority-shareholder suppression claim by citing to instances of varied conduct such as the construction of the trophy room, remodeling residences on Van Horn Farms, the assumption of John's debts related to his farming operation, the purchase of the insurance agency, the buyout of Sally's life estate interest, John's loans to Van Horn Farms, loan payments made to R.H., and the lack of dividends.

Because the continuing-wrong exception does not displace the statute of limitations in this case, we will consider only conduct occurring on or after April 14, 2006, when contemplating the minority-shareholder claims of oppression.

### 2. Oppression

Siblings June and William contend they suffered minority-shareholder oppression by the acts of their father, R.H., and brother, John. The siblings seek to dissolve the corporation under Iowa Code section 490.1430(1)(b)(2) over the objections of the controlling shareholders.

Our court previously described oppression as "an expansive term used to cover a multitude of situations dealing with improper conduct which is neither illegal nor fraudulent." *Maschmeier v. Southside Press, Ltd.*, 435 N.W.2d 377, 380 (Iowa Ct. App. 1988) (citing *Balvik v. Sylvester*, 411 N.W.2d 383, at 385 (N.D. 1987)). But *Baur II* later provided a more precise definition concluding "majority shareholders act oppressively when, having the corporate financial resources to do so, they fail to satisfy the reasonable expectations of a minority shareholder by paying no return on shareholder equity while declining the minority shareholder's repeated offers to sell shares for fair value." 832 N.W.2d at 674 (declining to catalogue "all the categories of conduct and circumstances that will constitute oppression frustrating the reasonable expectations of minority shareholders' interests"). *Baur II* also cautioned against oppression findings that would allow the minority shareholder to become the oppressor. *See id.* at 678 ("[C]ourts must be careful when determining relief to avoid giving the minority a foothold that is oppressive to the majority.").

William and June first take issue with the business court's conclusion they failed to show "evidence of any specific expectations beyond receipt of a proportionate share of the corporation's profits." They claim the court's phrasing created a new burden and required them to "prove a specific reasonable expectation" absent any support in Iowa jurisprudence. But they misinterpret the ruling. The court was responding to the siblings' claims that their reasonable expectations changed after they provided capital contributions to Van Horn Farms. And because "every [minority] shareholder may reasonably expect to share proportionally in a corporation's gains," we assume William and June held this reasonable expectation before their capital contributions. *See id.* at 673. But, as the business court noted, William and June did not demonstrate how their reasonable expectations differed from this standard expectation after making the capital contributions. We conclude the court did not impose an additional burden beyond the standard set in *Baur II*.

In support of their oppression claim, William and June argue John used certain accounting methods to disguise the financial health of Van Horn Farms and hide profits that would otherwise warrant shareholder distributions. William and June cite a 1999 letter in which John explained how he used cash-basis accounting to "manipulate" earnings to reduce the corporation's tax burden. According to William and June, the cash-based system incorrectly suggested Van Horn Farms could not afford distributions by allocating certain expenses to the corporation.[11] Specifically, they take issue with a $203,000 remodel to the century-old house

---

[11] June and William focus on the $165,000 depreciation of R.H.'s trophy room assigned to Van Horn Farms, but this occurred before 2006 and is beyond our consideration.

where John lived with his family, arguing the outlay was John's personal expense. We do not believe the home improvements support the expense claim by William and June. The house is owned by Van Horn Farms and the corporation could reap the benefits of the improvements should it decide to sell the house. Plus, John's use of the house serves as a part of his compensation as an employee of Van Horn Farms.

To bolster their contention that cash-based accounting hides the corporation's true profits, June and William note each year Van Horn Farms retained a significant amount of crops not reflected by the bottom line. They argue these commodities could be sold to generate additional income, which would then be reflected as profit. But, as the defendants counter, such sales would also impact the corporation's tax liabilities. And critically, the shareholders voted to operate on a cash basis at the first shareholders' meeting.

June and William highlight their expert David Hove, who opined that cash-basis accounting did not provide a "full, adequate disclosure of the economic profitability" of Van Horn Farms, and believed an accrual method would have offered a better matching of income and expenses. But the business court credited defense expert Lodden, a certified public accountant with more than four decades of experience with closely held farm corporations. Lodden testified that of his thirty to forty current farm clients, all but one uses cash-basis accounting; he observed "it's an anomaly to have a farm on an accrual basis." Lodden believed the cash method afforded his clients a better opportunity to minimize taxes. Even Hove conceded he has recommended cash-based accounting to clients due to its tax advantages. Accordingly, we are not convinced John's method of accounting

reveals an effort to hide profits or advances the minority-shareholder oppression claim. And while William and June complain Van Horn Farms's true financial health warranted distributions, they ignore the corporation's outstanding debts to R.H. and John and its documented practice of not paying dividends while carrying loans to shareholders.[12]

William and June also allege Van Horn Farms could have generated more revenue by renting out land for cash rather than employing John to farm. They cite a report by their expert Mark Gannon estimating "there would have been more than $4,000,000 of rental income to distribute since 2001 without any investment in machinery or buildings." But Gannon also testified John and R.H. appeared to be operating a "fairly typical farm" and did not appear to be doing anything intentionally to undercut yields or profit.

In this situation, we defer to the strategic decisions made by the farm corporate directors under the business judgment rule. *See Cookies Food Prods., Inc. v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 453 (Iowa 1988). The business judgment rule presumes directors' "decisions are informed, made in good faith, and honestly believed by them to be in the best interests of the company." *Id.* June and William argue under *Cookies Food Products, Inc.* the business judgment rule does not apply because John and R.H. have "self-interests" in the transactions at issue. *See id.* But as defendants point out, *Cookies Food Products, Inc.* was a derivative suit brought by minority shareholders who alleged that the majority shareholder violated his duty of loyalty to the corporation by self-

---

[12] William and June dispute this policy, but it is memorialized in the board of directors meeting minutes from 1995 and 1996.

dealing. *See Baur I*, 2010 WL 447063, at *9. Because the instant case is a minority-shareholder oppression action principally alleging improper failure to pay dividends, we employ the business judgment rule. *See id.* (concluding *Cookies Food Products, Inc.* does not apply to minority-shareholder oppression claim alleging freeze-out of minority shareholders). Applying the business judgment rule, we presume John and R.H.'s decision to farm the land rather than cash rent was made in good faith in the best interests of Van Horn Farms; June and William fail to prove otherwise.

Next, William and June claim their brother and father were enjoying "patronage" from the operation of Van Horn Farms.[13] As an example, they point to John's 2007 purchase of Sally's life estates with Van Horn Farms funds. William and June argue the life estates were a personal obligation of R.H. But minutes from the 1989 board of directors' meeting show the board, not R.H., granted the life estates to Sally. And Van Horn Farms had an interest in recovering those interests so it could operate without interference from a non-family member.

June and William also point to loans granted or assumed by John. But as expert Lodden opined, these loans were "a good business move" because John assumed the loans at lower interest rates or has lowered them in line with commercial loans currently available. Plus, John has not set a fixed repayment schedule permitting Van Horn Farms to make payments as it is able. Lodden also testified "it's very common for family farms and small closely held corporations to rely on a shareholder or shareholders for working capital, equipment loans, that

---

[13] At trial, plaintiffs' counsel defined "patronage" as "benefits that [the controlling shareholders] receive as a result of their position."

type of thing." Critically, R.H. and John do not draw large salaries. And we defer to the business court's credibility finding that Lodden accurately described John's home remodel as necessary and not extravagant.

Finally, William and Sally argue John's "lowball" offers to buy out their shares support their oppression claim. But to prove shareholder oppression, plaintiffs must show they made "repeated offers to sell shares for fair value" and those offers were rejected. *See Baur II*, 832 N.W.2d at 674. William and June never made offers to sell their shares (aside from settlement negotiations), let alone repeated offers. In the absence of repeated offers to sell their interests and corresponding refusals from John and R.H to purchase those interests at fair value, William and June are unable to show they suffered minority-shareholder oppression. *See id.*

## IV. Conclusion

R.H. did not have authority to convert shares from non-voting to voting through his dissolution stipulation, and Van Horn Farms never complied with the necessary formalities to effectuate that change. Accordingly, the distinction between voting and non-voting stock remained. As for the minority-shareholder oppression claim, looking within the five-year statute of limitations, we agree with the conclusion of the business court that June and William failed to show their reasonable expectations were frustrated by the actions of their brother and father.

**AFFIRMED.**