# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-2093

_____

Christine Ann Dollar

*Plaintiff - Appellee*

v.

Smithway Motor Xpress, Inc.; Smithway Motor Express Corp., a Nevada Corporation

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Northern District of Iowa - Ft. Dodge

_____

Submitted: October 20, 2011
Filed: March 27, 2013

_____

Before MELLOY, BEAM, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

Plaintiff Christine Ann Dollar sued her former employer alleging violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq. Following a bench trial, the district court found in favor of Dollar and awarded a total of $296,112 in back pay, front pay, and liquidated damages. The defendants (collectively "Smithway") appeal, raising arguments regarding Dollar's ability to return to her prior position or to a different position that the employer identified for Dollar weeks before

her termination. Smithway also raises issues regarding its own corporate identity and changes in its ongoing operations as relevant to the propriety and amount of the front-pay award. We vacate the front-pay award as unduly speculative given the unique circumstances of this case, but we affirm in all other respects.

I. Background

Smithway is a national over-the-road trucking carrier. In 1989, Dollar first began working for Smithway in its dispatch department in Fort Dodge, Iowa. In 1998, after working for approximately nine years, she suffered a serious and extended period of depression and used all of her banked sick leave. She returned to work for a short while but then voluntarily quit her job and moved out of the state.

Dollar returned to Fort Dodge and resumed employment with Smithway in March 2006. In December 2006, she sought and received a transfer to the position of "driver manager." The driver-manager position involved the supervision and coordination of thirty-five to forty truck drivers and required substantial interaction with the drivers. As a driver manager, Dollar's immediate supervisor was Todd Bird, and Bird's immediate supervisor was operations manager Al Kellett.

In May 2006, Dollar missed one day of work due to a minor illness, and in August 2006, she missed two days of work due to problems with depression medication. Dollar received an oral reprimand after the August absences as well as an email memorializing the reprimand, acknowledging her references to depression medication, and emphasizing the importance of attendance. In late September 2006, Dollar received an "acceptable" performance evaluation and a pay raise, but her reviewers noted the issue of attendance.

Dollar missed three and a half days of work in March 2007 and provided a medical excuse for three of the days. Bird discussed the absences with Dollar but did

not reprimand her. In late March, Kellett conducted a performance evaluation and gave Dollar another pay raise. Kellett also gave Dollar another overall performance evaluation of acceptable but noted that her attendance and resulting productivity were "below expectations." Kellett stated Dollar's strength was working with drivers, and he indicated that a different position working with drivers might be more appropriate. Kellett's evaluation stated:

> Chris need[s] to be an every day player and for the most part she has. We cannot afford to take excessive time off. [She has] had an issue recently and cannot afford additional issues of this type and remain in the Driver Manager Position. We have been in contact with HR to discuss options of a different position working with drivers.

By spring 2007, then, Dollar had missed a few days of work, her employer had noted that attendance was of particular concern for the driver-manager position, and her supervisor and the human resources department had begun looking for other positions that might be a good fit for her. The primary events leading to Dollar's termination occurred in June and July 2007 when Dollar's depression took a substantial and sustained turn for the worse. We address the events from this time frame in greater detail because the factual findings at issue on appeal relate to this time period.

On Sunday, June 10, 2007, Dollar suffered depression, anxiety and insomnia of sufficient severity that she had a friend take her to a hospital's emergency room. She sought to be admitted to the hospital's psychiatric ward, but was denied admission because she was not threatening suicide and did not pose a risk of harm to others. She was given a prescription for a sleep aid and told to contact a mental health center the next day.

On June 11, Dollar called Kellett before her shift was to start at 7:00 am and left a message stating she would not be at work. She then sought medical treatment

-3-

at the North Central Iowa Mental Health Center (the "Center") where a licensed mental health counselor re-diagnosed her with depression. The counselor prescribed a different depression medicine and instructed her to take time off from work. The counselor wrote a medical excuse stating, "Christine Dollar is being seen at the Mental Health Center for depression. She should stay off work through Tuesday June 19." The following day, Dollar left a voice-mail message for Kellet stating that she had received a medical excuse to be off work through June 19 and that she was being treated by the Center.

Dollar spoke to Kellett on the phone on June 13 or 14. During the call, Kellet told her she would no longer be working as a driver manager. Kellett did not know what her different position would be, but stated Tom Nelson, the Vice President of Human Resources and Safety, had a different position for her. Kellett also told Dollar that Nelson was on vacation and was expecting her to be back to work on June 25.

A psychiatrist at the Center met with Dollar on June 19, continued her medications, and determined she was not ready to return to work. The psychiatrist wrote a medical excuse stating Dollar was to remain on sick leave until July 9.

The next day, June 20, Dollar's father died, and his funeral was scheduled for June 25. Dollar called Smithway on June 25 and spoke to Nelson. Nelson told her she was expected to return to work on June 29 and that her new position would be as a driver recruiter. Dollar told Nelson of the psychiatrist's medical excuse to be off work until July 9. Nelson responded that if she did not return to work until July 9, he could not guarantee that she would have a job.

The following day, June 21, Dollar went to Smithway to drop off her medical excuses and talk to Nelson. Dollar's friend, Karen Byrd, accompanied Dollar and witnessed Dollar's conversation with Nelson. Nelson told Dollar he needed to fill the position of driver recruiter and could not guarantee that Dollar would have a job at

-4-

Smithway if she did not return to work immediately. Dollar told Nelson she was not ready to return to work and had a medical appointment on July 3. Nelson told her to call him after her July 3 medical appointment and he would let her know if she still had a job with Smithway.

On July 3, Dollar called Nelson before her appointment because the appointment was late in the day and she likely wouldn't be able to reach him after the appointment. Nelson told Dollar to leave a message after her appointment. At the appointment, Dollar was prescribed new medications and given a medical excuse stating, "Please excuse Christine from work until 7-30-2007. She is not ready to return to work on July 9, 2007."

On July 5, Dollar mailed the medical excuse to Nelson, and on July 6, she called Nelson to confirm his receipt of the excuse and tell him she was not ready to return to work. Nelson told Dollar he received the excuse but that the excuse did not make any difference. He stated he needed to fill the driver recruiter position immediately and would not hold it until July 30. Dollar asked Nelson if he was firing her, and Nelson replied yes. That day, Nelson filled out a company form noting Dollar's termination. The form appears to state Dollar's position was driver manager, although the word "manager" is unclear, and Nelson asserts Dollar's position was driver manager at the time he fired her. At the time of her termination, Nelson did not offer FMLA leave to Dollar or provide Dollar with any materials regarding FMLA leave or forms for physician certification of FMLA leave. Dollar did not expressly request FMLA leave.

Dollar then applied for unemployment benefits and Smithway objected, asserting she was fired for misconduct in that she had "Missed 28 days of YTD work + would not return." Notwithstanding this assertion and the fact of her termination just days prior, Nelson states that, at a telephonic unemployment hearing on July 11, he told Dollar and an unemployment hearing officer that Smithway had work for

-5-

Dollar and she could return whenever she wanted. Dollar, on the other hand, states that Smithway at no time told her she was a valued employee Smithway wanted to retain.

Dollar was initially denied unemployment benefits because she was found unable to work. On August 1, Dollar received medical clearance to work and, as a result, received unemployment benefits. Dollar at no time applied to return to Smithway, and she filed the present action approximately two years after her termination. Dollar received unemployment benefits for approximately fifteen months, during which time she was required to report her efforts at securing employment. While receiving the benefits, she sought other work and cared for her elderly mother who was suffering congenital heart difficulties following Dollar's father's death. Eventually, Dollar obtained employment as a desk clerk and night auditor at a motel in Fort Dodge where she worked full time, earned less than she had with Smithway, and enjoyed fewer benefits.

In the present complaint, Dollar asserted interference and retaliation claims. The defendants did not raise failure to mitigate damages as an affirmative defense in their answer nor in any other filings with the court. In a disclosure statement filed with the district court in August 2009, defendants made several disclosures regarding their corporate identity, including the following:

3.    The named Defendants became wholly owned subsidiaries of Western Xpress, Inc. in October 2007.
4.    Western Xpress, Inc. is a Tennessee corporation with its corporate offices in Nashville, Tennessee.
5.    Western Xpress, Inc. is directly impacted financially in the outcome of this case as the parent corporation of the named Defendants.

Dollar did not amend her pleadings to add Western Xpress, Inc., or Western Express, Inc. (collectively "Western Xpress"), as a defendant. No party presented evidence tending to prove the nature of the relationship between defendants and Western Xpress. A Tennessee attorney listing a physical address at "Western Express, Inc.," and listing an email address at "westernexp.com" moved for admission *pro hac vice* in this matter and asserted an association with local counsel in Iowa for defendants. Counsel for defendants purports to have described to Dollar's counsel prior to trial the relationship between the defendants and Western Xpress. Dollar's counsel does not deny that such a disclosure took place, but states he does not remember it.

The case progressed through the summary judgment stage with the district court denying a defense motion for summary judgment. The court's final pre-trial order referenced neither corporate identity nor failure to mitigate damages as issues for trial. At the commencement of the bench trial, however, the court and the attorneys addressed two issues pertinent to our opinion today.

First, counsel for defendants and counsel for Dollar disagreed as to the precise articulation of the primary liability-related issue in the trial. Dollar argued that the position to which she would have returned was driver recruiter. Defendants argued Dollar was never actually transferred to that position, she was a driver manager through the time of her termination, and any consideration of the position of driver recruiter would necessarily and improperly assume a duty of reasonable accommodation under the FMLA. The district court concluded:

> Well, I think there are significant differences in the statement of issue, but I think the issue in this case, regardless of how it was phrased in my summary judgment ruling or by the parties in the pretrial order is whether or not there was a position that the company had offered that she could go back to and perform in a reasonable fashion.

-7-

Second, counsel for defendants raised the issue of corporate identity for two apparent reasons. Counsel stated Western Xpress had acquired defendants' stock and, eventually, transferred all employees to Western Xpress such that defendants were no longer operating entities (although, according to defense counsel, defendants were still active corporations and held some assets). Based on these assertions, counsel indicated the belief that Western Xpress would not, in any event, be liable for any judgment arising from these proceedings. Counsel also suggested the alleged cessation of business activities by defendants prior to trial necessarily would limit any possible damage award such that, if Dollar were to prevail as to liability, she could only claim compensation up to the time that defendants ceased operations.

The district court indicated that the liability issue might be more complicated than defense counsel suggested due to the possibility of successor liability and due to the representation in the corporate disclosure that Western Xpress would be financially impacted by these proceedings. The district court also indicated it could simply allow Dollar to amend her complaint to add Western Xpress as a defendant and that defense counsel should have raised identity-related issues at an earlier time had defendants intended to rely on such issues to avoid liability. In that regard, the district court emphasized that Western Xpress had effective notice of all filings and could not claim to have been unaware or caught off guard as to potential liability. Ultimately, however, the court instructed the parties to move ahead with the presentation of evidence, deal with challenges to evidence regarding these issues as they might arise, and save for another day the question of whether liability would extend to Western Xpress.

Later in the trial, the court again expressed dissatisfaction with the parties' failure to provide evidence illuminating the issue of corporate identity and also with the lack of clarity regarding changes in operations and reductions in force after Western Xpress became involved with Smithway. Regarding potential Western Xpress liability for any resulting judgment, defense counsel argued that no evidence

-8-

of corporate identity would be required unless the court reached a plaintiff's verdict, at which time the parties could address questions of successor liability in a separate proceeding. Regarding the business activities of Smithway and Western Xpress, Dollar's counsel conceded that the burden of proof was on Dollar to prove the availability of jobs throughout any time period for which she sought damages. In particular, Dollar's counsel conceded it was Dollar's burden to establish that (1) the driver-recruiter position was available for her at the time of her leave, and (2) the position remained in Fort Dodge throughout the companies' changes.

Relevant testimony at trial not summarized above included testimony from Nelson stating unequivocally that, had Dollar returned to work on July 6, she would have returned as a driver recruiter. Nelson testified that the position of driver recruiter was the same as the position of driver manager in terms of hours, pay, benefits, and working conditions. Dollar testified that she was aware of the duties of a driver recruiter and believed she could have performed the job after receiving her medical release at the end of July 2007.

Nelson also indicated that, in July 2007 as well as at the time of trial, there were five driver recruiters in Fort Dodge. Another witness indicated that there may even have been an additional driver recruiter in Fort Dodge at the time of trial. Nelson and the other witness, however, described a substantial reduction in the overall number of Smithway/Western Xpress employees in Iowa between July 2007 and the time of trial. According to Nelson, whose exact testimony on this issue the district court credited, the workforce in Iowa was reduced by around 75% from 130 employees to 30–40 employees. As noted, however, at least five driver recruiters remained in Iowa at the time of trial. Nelson himself and other executive-level Smithway personnel lost their jobs with Smithway/Western Xpress in fall 2009. Finally, another employee located in Fort Dodge stated that he stopped receiving paychecks from Smithway and started receiving paychecks from Western Xpress in January 2010.

In a detailed written opinion, the district court rejected Dollar's retaliation claim. The court held, however, that Dollar was a qualified employee entitled to FMLA leave. The court found Dollar's repeated and conspicuous presentation of medical excuses and her detailed interactions with Kellet and Nelson were an adequate assertion of FMLA rights. The court concluded that Smithway interfered with Dollar's exercise of FMLA rights by terminating her with knowledge of her serious medical condition.

Importantly, the court made a detailed finding that Dollar, in fact, had been transferred to the position of driver recruiter prior to her termination. The district court set forth its finding with specific references to the pertinent testimony, explaining what testimony it credited and what testimony it rejected. The court held:

> I find that Dollar had been reassigned to a driver recruiter position at the time of her termination. While [Smithway] presented evidence, in the form of Nelson's testimony, that Dollar occupied the position of driver manager at the time of her termination, I reject Nelson's testimony on this point because it is clearly contradicted by other evidence in the record. Prior to her termination, on either June 13th, or June 14th, Kellet told Dollar that she was no longer going to be working in the Flatbed Division as a driver manager and that Nelson, [Smithway's] Vice President of Human Resources and Safety, had another position in the company for her. When Dollar subsequently spoke to Nelson, on June 25th, he confirmed what Kellet had told her, that she was no longer going to be working as a driver manager. Nelson told Dollar that, after her bereavement leave, her new position would be as a driver recruiter. No evidence was produced at trial that Dollar had the option of returning to work as a driver manager after June 13th, or June 14th. At that point, the only position available to her was as a driver recruiter, it is uncontested that, if Dollar had been able to return to work on July 6th, as Nelson insisted, she would have held the position of driver recruiter. I find that Dollar was a driver recruiter when she was fired. This fact is significant because [Smithway] failed to restore her to her former

position as a driver recruiter, a position that she could have performed despite her depression. As a result, Dollar suffered economic losses.

The court considered evidence of Dollar's pre- and post-Smithway earnings and awarded backpay to the date of the judgment in the amount of $80,793. The court awarded statutory liquidated damages in the same amount. The court also awarded front pay for a period of ten years in the amount of $134,526. The court rejected reinstatement as infeasible in the present case and did not include a multiple of front pay in the statutory liquidated damages award.

In determining front pay, the court noted that it was Dollar's burden to prove her entitlement to front pay to a reasonable degree of certainty and Smithway's burden to prove any failure to mitigate damages. The court found, however, that Smithway had not pleaded the affirmative defense of failure to mitigate damages and therefore had waived the issue. The court found in the alternative that even if Smithway had not waived the affirmative defense, Dollar, in fact, acted reasonably in seeking replacement employment and did not fail to mitigate her damages.

II.    Discussion

On appeal, Smithway presents three arguments. First, Smithway challenges the liability determination by arguing the trial court erred as a matter of law and fact in holding that Dollar was entitled to the position of driver recruiter because she had never held that position. Second, Smithway argues the trial court erred by awarding any damages because Smithway offered a position to Dollar post-termination, Dollar failed to accept the position, and Dollar therefore failed to mitigate her damages. Finally, Smithway argues the district court erred in awarding ten years of front pay because Smithway had ceased business activities prior to trial.

Following a bench trial, we review factual findings of the district court for clear error. Schaub v. VonWald, 638 F.3d 905, 923 (8th Cir. 2011). A district court's credibility determinations in a bench trial, like a jury's credibility determinations in a jury trial, are "virtually unassailable" on appeal. United States v. Quintana, 340 F.3d 700, 702 (8th Cir. 2003). Finally, front pay is an equitable remedy, and we review the decision to award front pay as well as the calculation of front pay for abuse of discretion. Christensen v. Titan Distrib., Inc., 481 F.3d 1085, 1098 (8th Cir. 2007).

## A.    Liability

"Under the FMLA, employers are prohibited from interfering with, restraining, or denying an employee's exercise or attempted exercise of any right contained in the FMLA." Quinn v. St. Louis Cnty., 653 F.3d 745, 753 (8th Cir. 2011). Interference claims cover "'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave,' as well as 'manipulation by a covered employer to avoid responsibilities under [the] FMLA.'" Id. (alteration in original) (quoting 29 C.F.R. § 825.220(b)). Termination in response to a qualifying employee's assertion of rights may qualify as interference. See Phillips v. Mathews, 547 F.3d 905, 914 (8th Cir. 2008) ("The termination of an employee for exercising rights under the FMLA could be viewed as actionable under § 2615(a)(1) as a denial of the employee's right under 29 U.S.C. § 2614(a) to be restored to an equivalent position upon return from FMLA leave.").

Here, Dollar admits that she could not have performed the functions of the driver-manager position even after she was medically approved to return to work. Dollar asserts, however, that she could perform the functions of driver recruiter. Smithway does not argue Dollar would have been physically or mentally unable to perform the job of driver recruiter after July 2007. Instead, Smithway argues Dollar never accepted or held the position of driver recruiter, and because Dollar could not

have performed the functions of her old position, driver manager, Smithway in no way interfered with Dollar's FMLA rights. By extension, Smithway argues any liability based upon a failure to permit Dollar to work as a driver recruiter after July 2007 impermissibly reads a duty of reasonable accommodation into the FMLA. Smithway does not present any other meaningful challenges to the underlying finding of FMLA liability.[1]

Smithway is correct that, unlike the Americans with Disabilities Act, the FMLA does not impose a duty of reasonable accommodation. Rather, the FMLA requires a qualifying employer to grant a qualifying employee twelve weeks of leave in a twelve month period if the employee suffers "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). In addition, the FMLA requires the employer to reinstate the employee to her original position or to an "equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment," 29 U.S.C. § 2614(a)(1)(B), following any such period of leave. Spangler v. Fed. Home Loan Bank of Des Moines, 278 F.3d 847, 851 (8th Cir. 2002). While not a duty to provide reasonable accommodation, the FMLA duty of restoration clearly and expressly broadens the employer's obligation beyond a narrow focus solely on the actual position held by the employee before onset of the serious health condition and extends to equivalent positions. See id. (comparing and contrasting the ADA and the

---

[1]Smithway repeatedly emphasizes the fact that Dollar failed to expressly request FMLA leave. To the extent Smithway is attempting to challenge the sufficiency of Dollar's notice to the company that she required FMLA leave, the challenge is without merit. An employee asserting FMLA rights need not invoke the statute by name, but "must provide 'information to suggest that h[er] health condition could be serious.'" Murphy v. FedEx Nat'l LTL, Inc., 618 F.3d 893, 903 (8th Cir. 2010) (alteration in original) (quoting Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005)). Dollar's repeated, conspicuous, and documented assertion of the need for leave due to serious depression satisfies the FMLA's notice requirement.

FMLA and noting that the FMLA does not require employers to restore employment following leave if "'the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition'" (quoting Reynolds v. Phillips & Temro Indus., Inc., 195 F.3d 411, 414 (8th Cir. 1999))).

Here, however, we need not reach the question of whether the driver recruiter position was an "equivalent" position. As quoted in detail above, the district court expressly found Dollar had been transferred to the position of driver recruiter prior to her termination. This finding of fact is well supported, depends upon the district court's credibility assessments, and was not clearly erroneous. The district court explained the testimony it relied upon and the testimony it rejected to reach this conclusion. Any subtle distinctions that may exist between the broad duty to provide reasonable accommodation pursuant to the ADA and the limited FMLA duty to restore an employee to the same or equivalent position following a qualifying period of leave are immaterial to the present appeal. The district court found Dollar had already been transferred to the position of driver recruiter at the time of her termination. As such, the defendants are simply incorrect in their assertion that the district court relied upon or imposed some larger duty to accommodate than actually exists within the FMLA. Accordingly, we reject Smithway's challenge to the district court's finding of liability.

B.     Failure to Mitigate Damages

Smithway also argues no damage award is appropriate because Dollar failed to mitigate her damages by accepting the "offer" to rehire Dollar purportedly extended by Nelson during the unemployment compensation hearing. The district court held Smithway's failure to plead the affirmative defense of failure to mitigate damages resulted in the waiver of this issue. The district court held in the alternative that the duty to mitigate damages required reasonable efforts and that Dollar

-14-

demonstrated reasonable efforts in attempting to secure other employment. The district court did not address Nelson's purported offer in its written opinion.

We agree with the district court that Smithway waived the affirmative defense of failure to mitigate damages. Federal Rule of Civil Procedure 8(c)(1) requires defendants to plead affirmative defenses. The Rule is written in general terms and includes a non-exhaustive list of affirmative defenses that must be pled. Although the Rule does not expressly list failure to mitigate damages, we have held that this affirmative defense falls within the general requirement of Rule 8(c)(1), the list of enumerated defenses is exemplary rather than exclusive, and the failure to plead this particular affirmative defense results in waiver. See Sayre v. Musicland Grp., Inc., 850 F.2d 350, 354 (8th Cir. 1988) ("As with other affirmative defenses, failure to plead mitigation of damages as an affirmative defense results in a waiver of that defense and its exclusion from the case.").

We have also indicated, however, that such a waiver is not absolute and that inclusion of an otherwise-waived issue in a final pre-trial order may, in some cases, preserve or revive the issue for trial. See, e.g., Friedman & Friedman, Ltd. v. Tim McCandless, Inc., 606 F.3d 494, 498–99 (8th Cir. 2010) (holding that inclusion of failure to mitigate damages as an issue in a final pre-trial order saved the issue from waiver under Rule 8(c) even though the defendant had failed to plead the issue). Here, however, the affirmative defense was not included in any such order. Further, other than the apparently unplanned introduction of Nelson's testimony concerning a purported offer, the defendants presented neither evidence nor arguments to the district court suggesting that Dollar had rejected an offer of re-employment or that such a rejection might categorically establish a failure to mitigate damages. Accordingly, the issue was waived.

Even if not waived for the reasons just discussed, we agree with the district court's alternative holding that Dollar's efforts to secure other employment were

-15-

reasonable. Mitigation of damages requires reasonable efforts; it does not require success and does not necessarily require a plaintiff to accept a particular position. See Kehoe v. Anheuser-Busch, Inc., 96 F.3d 1095, 1106 (8th Cir. 1996) ("It is axiomatic that . . . 'plaintiffs use reasonable efforts to obtain other employment after termination.'") (quoting Rhodes v. Giberson Oil Tools, 82 F.3d 615, 621 (5th Cir. 1996)); Smith v. World Ins. Co., 38 F.3d 1456, 1464–65 (8th Cir. 1994) (discussing the interplay between the duty to mitigate and offers of reinstatement and noting that a reasonable refusal of an offer of reinstatement does not cut off the availability of damages at that point in time). Also, the evidence Smithway presented concerning Nelson's purported offer is contested and comes from a witness the district court found to be only partially credible. As such, the contested evidence of purported offer provides insufficient grounds to disturb the district court's factual finding that Dollar's mitigation efforts were reasonable. See Kehoe, 96 F.3d at 1106 ("We will review a finding that a plaintiff used reasonable efforts to obtain other employment as a determination of fact, reversible only if clearly erroneous.") (internal quotation marks omitted).

In so holding, we acknowledge Smithway's argument that the district court did not discuss the impact of Nelson's purported offer of employment during the unemployment compensation hearing. This omission is not surprising, however, given the manner in which the evidence of the purported offer entered the record. A review of the trial transcript reveals that defense counsel stated when eliciting the testimony from Nelson that he had not known of the purported offer prior to a recess in the trial and that Nelson had just told him of the offer during that recess. It is clear then that counsel not only failed to plead the affirmative defense or identify it as an issue for trial, counsel only introduced the claim of a purported offer as a lately-discovered fact without context or argument.

C.    Front Pay

The district court determined that, as of the time of its judgment—more than three and one half years following Dollar's termination—Dollar was entitled to back pay representing compensation through the date of judgment. The court also determined she was entitled to front pay for a future period of ten years. Given changes in the Iowa operations of the defendants and/or their owner or successor, given the substantial reduction in force that occurred in Iowa between Dollar's termination and trial, and given the important fact that Dollar was untested and inexperienced in the position of driver recruiter, we believe any award of front pay in this case involves an impermissible degree of speculation.

Front pay is an equitable remedy courts may award when it is determined reinstatement is no longer feasible, and we have characterized awards of front pay as substitutes for reinstatement. See Sellers v. Mineta, 358 F.3d 1058, 1063 (8th Cir. 2004) ("Front pay is a disfavored remedy that may be awarded in lieu of reinstatement, but not in addition to it, where the circumstances make reinstatement impractical."). Awards of front pay are always at least partially speculative as they necessarily rest upon predictions and assumptions about a plaintiff's longevity, the likely duration of any future employment, the continued viability of the employer, ongoing efforts at mitigation, and countless other factors. See Mathieu v. Gopher News Co., 273 F.3d 769, 782 (8th Cir. 2001) ("An award of front pay also is inherently speculative in length of time and when considering possible mitigation by reason of other employment. It is based on probabilities rather than actualities."). We review an award of front pay for abuse of discretion and do not mean to suggest that some unattainable degree of metaphysical certainty is required in order to justify an award of front pay. Christensen, 481 F.3d at 1098. Some degree of speculation is inescapable, but we have recognized limits to the amount of speculation that such an award may embody. See, e.g., United Paperworkers Int'l Union, AFL-CIO, Local 274 v. Champion Int'l Corp., 81 F.3d 798, 805 (8th Cir. 1996).

The facts of the present case are unique in that the district court expressly found that Dollar had been transferred to the position of driver recruiter prior to her termination even though she had not actually performed the work of that position for as much as a single day. Dollar testified that she was aware of the requirements of the driver-recruiter position and believed she could have performed the functions of the job after receiving her medical clearance to return to work on August 1, 2007. The parties appear to agree that the position of driver recruiter was somewhat less stressful than the position of driver manager. The parties also appear to believe that attendance issues for a driver recruiter would be less disruptive to the employer than for a driver manager—this distinction was the driving force for the March 2007 decision to seek out a different position for Dollar. The fact remains, however, that Dollar was wholly untested in the driver-recruiter position, and the only evidence of her ability to perform the job is her personal, subjective belief and the company's vote of confidence in her as expressed in the fact of her transfer. Even in the absence of corporate restructuring, changes in operations, or reductions in force, then, substantial speculation is required to conclude that Dollar would have remained in the position of driver recruiter more than the three and one half years following her termination that represent the period of time covered by her back-pay award.

Her lack of experience in the job, however, is not the only issue making the front pay determination in this case unusually speculative. Rather, substantial changes in operations add greatly to the amount of uncertainty surrounding her future prospects with Smithway (and/or Western Xpress).[2] The approximately 75%

_____

[2]For the purposes of our present decision, we have de-emphasized the technical details surrounding the corporate identity or corporate ownership of Smithway, the merger with or acquisition by Western Xpress, and the resultant impact these transactions may have on Western Xpress's eventual liability towards Dollar. For the limited purpose of assessing the likelihood that Dollar would have remained employed by the employer entities (however named or owned and in whatever form), the critical inquiry requires that we focus on the entities' actual operations. To the

-18-

reduction in force in Iowa occurred prior to trial and represents an undisputed shift of overall operations away from Iowa. Nelson and other higher-ranking employees were terminated or reassigned. Given the quantity of positions eliminated in Iowa, the long-term need for driver recruiters in Iowa is unclear. The district court relied heavily upon the fact that, as of trial, the number of driver recruiters in Iowa had not been reduced. Looking forward, however, it requires an impermissible degree of speculation to assume that number of driver recruiters would remain unchanged given the context of the larger reduction in force.

Nothing about the present case suggests that factors courts commonly apply to assess front pay awards merit particularly heavy emphasis or might somehow permit us to accept an unusually high degree of speculation. See, e.g., Ogden v. Wax Works, Inc., 29 F. Supp. 2d 1003, 1015 (N.D. Iowa 1998), aff'd, 214 F.3d 999 (8th

---

extent we may be overly downplaying the significance of corporate identity or ownership, the burden to prove an entitlement to front pay with reasonable certainty fell on Dollar, and the omission of details as to the identity, control, and operation of the entities involved does not enure to her benefit on this issue. See, e.g., Barbour v. Merrill, 48 F.3d 1270, 1279–80 (D.C. Cir. 1995) (describing the plaintiff's burden to prove a reasonably certain front pay award, and the defendant's burden to challenge that proof and assert the affirmative defense of failure to mitigate damages).

At a minimum, Dollar's counsel was made aware of a potentially relevant change of form or control involving Western Xpress when the defendants filed their corporate disclosure in the district court more than one and one half years prior to trial. Given this notice and the burden of proof as to front pay, omissions in the record only increase the degree of speculation involved in the present front-pay determination. Finally, we reject as overly simplistic the defendant's argument that the technical cessation of activities by one corporation necessarily cuts off the right to front pay from a successor corporation. Companies change form often and for varied reasons that may or may not impact the likelihood of a particular employee's continued employment. Of course, such details will be relevant to the present parties' eventual battle as to whether Western Xpress can be held liable for the present judgment against Smithway.

Cir. 2000) (collecting cases from several jurisdictions and discussing commonly applied factors). For example, the duration of past employment is a factor our court has considered in assessing front pay. See Standley v. Chilhowee R-IV Sch.Dist., 5 F.3d 319, 322 (8th Cir. 1993). Here, Dollar had worked for Smithway for almost nine years, but that period of employment ended in 1998. After returning to Smithway seven years later, she worked for only slightly more than the one year required to trigger FMLA rights when her attendance issues became a concern. Dollar's particular employment history, then, provides no grounds to overlook the undisputed facts that she was untested and unproven in the role of driver recruiter at the time of her termination and that the company was shifting its operations away from Iowa.

Finally, and importantly, we note that because front pay is an equitable remedy, it is appropriate to consider all of the circumstances of a case to assess whether an award is appropriate. See id. at 322(emphasizing that "front pay is an equitable remedy[,]" "the court must avoid granting the plaintiff a windfall[,]" and "the trial court must consider many complicated factors in deciding whether to award front pay." ). Here, the transfer to the position of driver recruiter in and of itself was an attempt to address attendance concerns, and Dollar admitted she did not view the transfer as an adverse or negative action. The transfer was not necessarily required by the FMLA. As a result, Dollar's case presents a strange situation. The employer willfully interfered with the employee's FMLA rights[3], but the employer's own arguably laudable earlier attempts to accommodate the employee were the very acts that made possible the underlying recovery of back pay and liquidated damages. The defendants simply were not required to reinstate Dollar to the position of driver manager, a position she admits she would not have been able to perform. Spangler, 278 F.3d at 851 ("If [an employee] had a serious health condition which made her

---

[3]The district court found the interference was willful as necessary for the award of liquidated damages based largely upon Nelson's statements and reactions to Dollar's requests for leave.

-20-

unable to perform her job and if she made a valid request for FMLA leave, upon the expiration of her leave, the [employer] would be under no obligation to reinstate her if she remained unable to perform the essential functions of her position."). As such, the finding that defendants actually transferred Dollar to the position of driver recruiter prior to her termination—a position the court found she could have performed upon return from leave—was vital to the attachment of any liability in this case. Given the equitable nature of the front-pay remedy and the peculiar facts of the present case, we believe it is particularly important to guard against an overly speculative award in this context.[4]

Accordingly, we vacate the award of front pay but affirm the carefully articulated judgment of the district court in all other respects.

_____

[4]Some courts view the grant or denial of punitive damages to be material to the front-pay inquiry. We have held that liquidated damages like those available in FMLA actions are punitive in nature. See Newhouse v. McCormick & Co., 110 F.3d 635, 643 (8th Cir. 1997) ("[L]iquidated damages are punitive in nature under the ADEA. Front pay, on the other hand, is equitable relief that may be obtained in lieu of reinstatement." (internal citation omitted)). We have also held, however, that the grant or denial of punitive damages should not be an overly important consideration in front pay determinations, given the different purposes of punitive damages awards and front pay as a form of compensation in lieu of reinstatement. Id. ("The jury's finding of willfulness and the resulting award of liquidated damages simply does not affect the district court's determination of appropriate equitable relief."). Still, general equitable principles require that any equitable award be viewed in the greater context of a given case with all of the varied, unpredictable, and unusual facts that may exist. Our review of the facts in this case leaves us with the firm impression the award of front pay is too speculative and would be an impermissible "windfall" for the plaintiff.