# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-3162

_____

Janice Wright

*Plaintiff - Appellant*

v.

St. Vincent Health System, (originally named as St. Vincent Infirmary Medical Center)

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: May 24, 2013
Filed: September 18, 2013

_____

Before RILEY, Chief Judge, GRUENDER and BENTON, Circuit Judges.

_____

RILEY, Chief Judge.

Janice Wright sued her former employer, St. Vincent Health System (hospital), alleging racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e, et seq., and 42 U.S.C.

§ 1981.  After a two-day bench trial, the district court[1] found in favor of the hospital on all claims.  Wright appeals the judgment, arguing the district court's factual findings were clearly erroneous.  Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.   BACKGROUND

In November 2007, Janice Wright began working for the hospital as a surgical technologist.[2]  In 2008, Wright accepted a newly created position working the night shift (7:00 p.m. to 5:30 a.m.) in the operating room (OR).  Before Wright accepted the position, two registered nurses, Bill Rieske, a Caucasian man, and Nancy Bell, an African-American woman, performed most of the duties the hospital asked Wright to perform.  After training Wright and Bell to complete the night duties as a team, Rieske moved to a weekend shift.  When Wright and Bell were not assisting with emergency surgeries, they cleaned rooms, moved and made surgical beds, stocked supplies, assembled equipment, and set up operating rooms for the next day's surgeries.

A few months after Wright and Bell began working together, Bell suffered an injury at home that prevented her from coming to work.  Other nurses initially assisted in covering Bell's shifts in addition to their regular duties, but Wright was the only employee dedicated to the night shift.  The covering nurses carried the phone and responded to emergencies, but did not help Wright prepare the operating rooms.  After three months, the nurses stopped taking Bell's shifts.  When Bell did not return

---

[1]The Honorable D. Price Marshall, Jr., United States District Judge for the Eastern District of Arkansas.

[2]A surgical technologist assists the surgical team under the supervision of the surgeon and a registered nurse.  Duties include gathering instruments and supplies for surgery, assisting during surgery, and maintaining a sterile operating environment.

as expected, Wright was left alone on the night shift to complete all the duties she and Bell previously shared.

Wright's performance began to suffer. On September 25, 2008, in response to a complaint that Wright had not prepared the operating rooms properly on September 23, 2008, Patient Care Coordinator (PCC)[3] Darla Tiner, Wright's direct supervisor, issued Wright a Counseling/Corrective Action Form (disciplinary form). Wright explained she was assisting with surgery for several hours on the night in question, but Tiner believed Wright could have completed her duties during the rest of her shift. Wright refused to sign the form, and another PCC, Verda Degerald, reported that Wright became defensive and did not indicate a "desire to correct [her] behavior."

After that incident, Tiner prepared a checklist of equipment Wright was required to ensure was in each operating room. On September 29, 2008, Wright received a second disciplinary form for failing to complete the checklist on September 26, 2008. Tiner also noted Wright failed to report orally the events of the night shift as required.

On October 6, 2008, Tiner and Laurie Voigt, then Interim Director of Surgical Services, provided Wright a prioritized, written list of duties the PCCs expected Wright to perform each night. Tiner and Voigt advised Wright that if there were no further disciplinary issues for three months, they would remove the September 29, 2008, disciplinary form from Wright's file. When Wright asked to be returned to the day shift, Tiner and Voigt advised Wright the staffing matrix was being evaluated and no permanent changes would be made until further notice.

---

[3]The hospital designated some surgical nurses as PCCs, giving them supervisory authority within individual departments.

On January 21, 2009, Tiner gave Wright a final warning for two incidents occurring in December 2008. The disciplinary form indicated that on December 16, 2008, Wright was wrapped in a blanket and sleeping in a recliner, and she failed to prepare properly the operating rooms for surgery. At trial, Wright admitted she was reclined in the chair and covered with a blanket, but denied she was sleeping or that it was unusual for staff to be in the lounge during down periods. The disciplinary form further indicated that on December 18, 2008, "Wright delayed emergency care for a patient in the ICU who needed surgical treatment for a nose bleed." Tiner advised Wright any further disciplinary action "could result in further corrective action up to and including termination."

Wright appears to have worked without further incident until July 2009. On July 9, 2009, Cindy Sacker, then Director of Surgical Services,[4] received a complaint from a doctor that Wright had failed to inform the day staff that the doctor wanted to perform surgery the morning of July 3, 2009, forcing the doctor to delay the surgery. Degerald also advised Sacker that Wright had not been properly setting up the operating tables. On July 9, 2009, at 11:14 a.m., Sacker contacted Wright at home by telephone to discuss the complaints and schedule a meeting for Monday, July 13, 2009. Wright attempted to explain each of the issues and complained of a double standard at the hospital. Wright testified Sacker became angry, while Wright remained agreeable. In contrast, Sacker testified Wright became "belligerent" and "insubordinate" and told Sacker, "Just fire me, go ahead and fire me."

After the call, Sacker contacted Chris Cockrell, the hospital's Employee Relations Coordinator, to inform him of Wright's "inappropriate" and "aggressive" behavior and ask what disciplinary steps she could take. Cockrell advised Sacker she could discipline Wright, including termination. When Sacker called Cockrell again

_____

[4]Sacker, who supervised the PCCs, reported directly to Wes Garrison, Service Line Administrator, who in turn reported to Brenda Baird, Chief Nursing Officer.

to determine whether she could terminate Wright over the phone, Cockrell advised it was permissible, but not ideal. Sacker testified she also met with the PCCs that afternoon to inform them, for scheduling purposes, of the decision to terminate Wright and, later that day, confirmed her decision with Garrison and Baird.

Wright denies reacting negatively during the phone call and challenges Sacker's timeline of events. Wright testified that when the call with Sacker ended, Wright "thought everything was fine." Wright worked her regular shift that night without incident and without speaking to Sacker or anyone else. Wright testified she expected to meet with Sacker on July 13, 2009, as planned, to discuss the issues raised during the call. On July 10, 2009, at 10:30 a.m., Wright called the hospital's human resource department to complain of racial discrimination. The receptionist transferred Wright's complaint call to Cockrell. Wright testified Cockrell placed her call on hold for several minutes, and when Wright hung up and called back, Cockrell was unavailable.

Denying he placed Wright on hold, Cockrell testified Wright complained during the call that she was being treated unfairly and harassed due to racial discrimination. Cockrell advised Wright he would like to meet with her in person to obtain her statement and would prepare the necessary paperwork for her to pick up that afternoon. Wright never gave a statement or retrieved the paperwork.

Sacker called Wright on her cell phone on July 10, 2009, at 11:18 a.m. and terminated Wright's employment at the hospital effective immediately. Sacker testified neither Wright's race nor her discrimination complaint played any role in Sacker's decision to terminate Wright. After the call from Sacker, Wright contacted an attorney, who quickly prepared and sent by facsimile a letter to Cockrell on Wright's behalf accusing Cockrell of informing Sacker of Wright's discrimination complaint and causing Wright's termination. Wright asserts Cockrell never responded to her letter. At trial, Cockrell testified he tried unsuccessfully to contact

Wright by phone to explain (1) Cockrell had not contacted Sacker regarding Wright's complaint before Wright's termination, and (2) Wright could challenge her termination through the hospital's grievance process.

Later on July 10, 2009, Cockrell asked Sacker to prepare a timeline of events leading to Wright's termination. Sacker sent Cockrell a timeline by email on July 10, 2009, at 4:03 p.m.

Wright did not appeal her termination or any of the hospital's other disciplinary actions through the hospital's grievance procedures. On September 16, 2009, Wright filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission (EEOC), alleging she was discharged because of her race and in retaliation for complaining of discrimination. The EEOC issued a Dismissal and Notice of Rights, authorizing Wright to sue the hospital.

On April 23, 2010, Wright filed suit in the district court, alleging racial discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981. The district court conducted a two-day bench trial beginning August 16, 2012. The district court found in favor of the hospital on all of Wright's claims, issuing oral findings of fact and conclusions of law from the bench. On August 21, 2012, the district court entered judgment in favor of the hospital and dismissed Wright's complaint with prejudice. Wright timely appealed.

## II. DISCUSSION
### A. Standard of Review

"In reviewing a judgment after a bench trial, this court reviews 'the [district] court's factual findings for clear error and its legal conclusions de novo.'" Outdoor Cent., Inc. v. GreatLodge.com, Inc., 688 F.3d 938, 941 (8th Cir. 2012) (quoting Tadlock v. Powell, 291 F.3d 541, 546 (8th Cir. 2002)); see also Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set

aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."). "Under the clearly erroneous standard, 'we will overturn a factual finding only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error was made.'" Urban Hotel Dev. Co. v. President Dev. Grp., L.C., 535 F.3d 874, 879 (8th Cir. 2008) (quoting Roemmich v. Eagle Eye Dev., LLC, 526 F.3d 343, 353 (8th Cir. 2008)).

## B.    Retaliation

Wright contends the district court clearly erred in concluding she failed to prove the hospital terminated her in retaliation for complaining of racial discrimination. According to Wright, the district court "apparently adopted a standard of requiring direct evidence to prove that Ms. Wright was the victim of retaliation, because the evidence was overwhelming that [the hospital] terminated Ms. Wright due to her desire to file a complaint of discrimination against Cindy Sacker." Wright is wrong.

Title VII and 42 U.S.C. § 1981 prohibit employers from retaliating against employees for opposing racial discrimination. See 42 U.S.C. § 2000e-3(a); CBOCS W., Inc. v. Humphries, 553 U.S. 442, 454-55, 457 (2008); Kim v. Nash Finch Co., 123 F.3d 1046, 1059 (8th Cir. 1997). Though each statute provides "separate, distinct, and independent" remedies for unlawful retaliation, Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 461 (1975), the elements of Wright's Title VII and 42 U.S.C. § 1981 retaliation claims "are identical." Kim, 123 F.3d at 1060, 1063 ("Title VII and § 1981 set forth parallel, substantially identical, legal theories of recovery in cases alleging intentional discrimination in employment on the basis of race."); see also Takele v. Mayo Clinic, 576 F.3d 834, 838 (8th Cir. 2009) ("We apply the same analysis to claims of discrimination and retaliation under Title VII and 42 U.S.C. § 1981."). To prevail on her retaliation claims under either statute, Wright must prove (1) she engaged in protected activity; (2) she suffered a materially adverse

employment action; and (3) the materially adverse action was causally connected to Wright's protected activity.  See Kim, 123 F.3d at 1060; see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006) (discussing materiality).

To establish causation, Wright must prove "the desire to retaliate was the but-for cause of" her termination—that is, "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the [hospital]." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. ___, ___, 133 S. Ct. 2517, 2528, 2533 (2013); see also Van Horn v. Best Buy Stores, L.P., 526 F.3d 1144, 1148 (8th Cir. 2008) ("To make out a retaliation claim, the plaintiff must show that the protected conduct was a 'determinative—not merely a motivating—factor' in the employer's adverse employment decision." (quoting Carrington v. City of Des Moines, Iowa, 481 F.3d 1046, 1053 (8th Cir. 2007))).

After reviewing the trial evidence, the district court determined "the greater weight of the evidence" indicated "retaliation did not play a part . . . . and . . . was certainly not the determining factor" in Wright's termination.[5] Noting the "incredibly suspicious timing" of Wright's termination, the district court found the evidence would permit an inference of retaliation, but stated the district court's "view of the proof, listening to the witnesses and considering the exhibits, is that the decision to terminate Ms. Wright was made on July 9th before [Wright] called Mr. Cockrell and alleged racial discrimination."  Among other things, the district court credited

---

[5]Deciding this case without the benefit of the decision in Nassar, the district court noted some uncertainty about the standard of causation for Wright's retaliation claims.  Although the district court correctly determined the determining-factor standard applied, the district court also applied the motivating-factor standard "out of an abundance of caution." Cf. 8th Cir. Civil Jury Instr. §§ 5.00, 5.90, 10.00, 10.40 (2013).  In light of Nassar and our precedent, it is now definitively established that the determining-factor standard logically must be met in both Title VII and § 1981 retaliation cases. See Nassar, 570 U.S. at ___, 133 S. Ct. at 2534; Bennett v. Riceland Foods, Inc., 721 F.3d 546, 551 (8th Cir. 2013); Kim, 123 F.3d at 1063.

Sacker's testimony based on Sacker's candor regarding her memory and the reasonableness of Sacker's explanation for calling Wright on July 10. The district court also found Sacker's post-termination timeline "was a good faith attempt to document what had happened."

Highlighting the temporal proximity between her complaint and her termination, Wright argues "[t]he fact that the adverse employment action occurred within forty-five (45) minutes of the protected activity is strong circumstantial evidence that no reasonable fact-finder can overlook." Even stronger is the evidence Sacker decided to terminate Wright *before* the discrimination complaint: Sacker's preparation began on July 9 amid termination discussions with Cockrell and the PCCs, and on the afternoon of July 9—the day before Wright complained—Sacker informed the PCCs of Wright's impending termination.

The district court did not "overlook" Wright's evidence. Rather, it concluded her evidence was outweighed by substantial record evidence indicating Sacker did not terminate Wright in retaliation for claiming discrimination. "Where there are two permissible views of the evidence, the [district court's] choice between them cannot be clearly erroneous." Schaub v. VonWald, 638 F.3d 905, 915 (8th Cir. 2011) (citing Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985)). Such is the case here.

The district court described the timing as "incredibly suspicious," but reasonably found the timing alone was not sufficient to carry Wright's burden. While a "temporal link" between the protected activity and a materially adverse employment action may be "sufficient to create an inference of retaliation," Bassett v. City of Minneapolis, 211 F.3d 1097, 1105 (8th Cir. 2000), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031, 1043, 1059 app. (8th Cir. 2011) (en banc), we have generally required "more than a temporal connection" to establish a retaliation claim, Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc). See EEOC v. Kohler Co., 335 F.3d 766, 773 n.7 (8th Cir. 2003)

("[T]iming alone is usually insufficient to establish that the employer's legitimate non-discriminatory reason for discharge is pretext."). The district court found Sacker's testimony adequately explained the timing of Wright's termination.

Wright questions Sacker's credibility and the reliability of Sacker's timeline. But "[a] district court's credibility determinations in a bench trial, like a jury's credibility determinations in a jury trial, are 'virtually unassailable' on appeal." Dollar v. Smithway Motor Xpress, Inc., 710 F.3d 798, 806 (8th Cir. 2013) (quoting United States v. Quintana, 340 F.3d 700, 702 (8th Cir. 2003)). Giving due weight to the district court's "superior position to determine the witnesses' credibility, and to resolve conflicts in the testimony," see Johnson v. Bunny Bread Co., 646 F.2d 1250, 1253 (8th Cir. 1981), we conclude the district court's factual findings with respect to Wright's retaliation claims are supported by the evidence.

## C.    Disparate Treatment—Termination

Wright next contends the district court clearly erred in finding Wright "failed to prove that race was the motivating factor behind" Wright's termination. See Nassar, 570 U.S. at ___, 133 S. Ct. at 2526 (describing the "lessened causation standard" of 42 U.S.C. § 2000e-2(m), which enables a complaining party to prove "unlawful employment" discrimination by "demonstrat[ing] that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice"). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000). Wright can meet her burden of proving the hospital "'intentionally discriminated against'" her based on her race in violation of Title VII and 42 U.S.C. § 1981 "'either directly by persuading the [district] court that a discriminatory reason . . . motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' In short, the district court must decide which party's explanation of the employer's motivation it believes." U.S. Postal Serv. Bd.

of Governors v. Aikens, 460 U.S. 711, 715-16, 103 (1983) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)) (explaining we must focus on discrimination *vel non* when an appeal in a discrimination case follows a bench trial on the merits); see also Ross v. Kan. City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir. 2002) (recognizing that, following the Civil Rights Act of 1991, Pub. L. No. 102–166, Tit. I, 105 Stat. 1071 (1991), we apply substantially the same standards to similar racial discrimination claims under Title VII and 42 U.S.C. § 1981); Kim, 123 F.3d at 1063 ("The elements of claims alleging disparate treatment on the basis of race under Title VII and intentional employment discrimination on the basis of race under § 1981 are identical.").[6]

Here, the district court believed Sacker's explanation that she terminated Wright for being insubordinate during the July 9, 2009, call—not because Wright is African-American. After considering Wright's testimony suggesting the call "ended in sweetness and light," the district court credited testimony from Sacker and Cockrell regarding Wright's "passionate, angry conduct" during the call. The district court explained its "best judgment . . . [was] that [Wright] lost [her] temper and had had enough of all of this, and that [Wright was] angry in that call and [Wright's anger during the call] prompted the termination rather than a racial motivation or discrimination."

---

[6]The parties do not dispute that the motivating-factor standard applied to Wright's discrimination claims under both Title VII and § 1981, and the district court applied that standard, finding no racially discriminatory motive. However, the comments to the Eighth Circuit model jury instructions suggest there is some confusion as to the appropriate causation standard to apply in § 1981 racial discrimination claims. See 8th Cir. Civil Jury Instr. §§ 5.00, 11.00, 11.40 n.5 (stating "[t]he appropriate standard in a section 1981 case is not clearly resolved"), 11.41; cf. EEOC v. Con-Way Freight, Inc., 622 F.3d 933, 937 (8th Cir. 2010) (declining to decide whether the mixed-motive amendments to Title VII "apply in § 1981 actions"). Our holding in Kim necessarily determined the same causation standard applies in parallel Title VII and § 1981 racial discrimination claims.

Wright's challenge to the district court's reasoned judgment is primarily based on the "demographics of the operating room." Quoting Carter v. Ball, 33 F.3d 450, 456 (4th Cir. 1994), for the proposition that "[s]tatistics can provide important proof of employment discrimination," Wright avers Sacker terminated three African-American employees, including Wright, and no Caucasian employees in the nine months Sacker was with the hospital. Wright further notes eight of twelve employees the hospital terminated from the surgical department from 2008 to 2010 were African-American, including Wright.

Wright's inchoate statistical analysis falls short of showing clear error. See Williams v. Ford Motor Co., 14 F.3d 1305, 1310 (8th Cir. 1994) (holding "bare statistics, without more [i.e., a cogent comparison to similarly situated[7] non-minority employees who were treated differently], were insufficient . . . to prove" unlawful racial discrimination). In admitting Wright's statistical evidence over the hospital's relevance objection, the district court stated there was "some marginal evidentiary value in having the big picture, having the context," but cautioned Wright the district court was "very wary of moving from those numbers en masse to an inference of discrimination." See Furnco Constr. Corp. v. Waters, 438 U.S. 567, 580 (1978) (deciding trial courts are "entitled to *consider* the racial mix of the work force when trying to make the determination as to motivation"). When the district court advised Wright of the importance of apt comparators and warned the statistical evidence alone was "not much of a case if that's all there is," Wright assured the district court that

[7]"The test for whether employees are similarly situated 'is rigorous and requires that the other employees be similarly situated in all relevant aspects before the plaintiff can introduce evidence comparing herself to the other employees.'" Davis v. Jefferson Hosp. Ass'n, 685 F.3d 675, 681 (8th Cir. 2012) (alteration omitted) (quoting Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 864 (8th Cir. 2008)). "'The individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and [have] engaged in the same conduct without any mitigating or distinguishing circumstances.'" Id. (alteration in original) (quoting Morgan v. A.G. Edwards & Sons, Inc., 486 F.3d 1034, 1043 (8th Cir. 2007)).

the statistical evidence was offered "to kind of give the Court some kind of picture of what the racial makeup is of the department."

On appeal, Wright does not even discuss the racial makeup of the entire surgical department during the relevant period or otherwise provide context for her claims, cf. Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 310 (1977) ("What the [employment] figures prove obviously depends upon the figures to which they are compared."), much less address the differences in supervisors and discharge circumstances that might affect her rudimentary statistical analysis. See Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 777 (8th Cir. 1995) (declaring "statistical evidence is not probative of pretext [if] it fails to analyze the treatment of comparable employees"). "For the statistical comparison to be probative in persuading the trier of fact on the ultimate issue of discrimination, [Wright] must establish that the Caucasian employees who were [purportedly treated differently] were 'similarly situated in all relevant respects' to the African-American employees." Williams, 14 F.3d at 1309 (quoting Smith v. Monsanto Chem. Co., 770 F.2d 719, 723 (8th Cir. 1985)). Wright has not done that.

Wright vaguely relies on the testimony of Zenobia Smith, the only African-American PCC in the OR, presumably to imply discrimination in the department based on Smith's experiences in her impressive thirty-four years at the hospital. But Smith testified (1) none of the terminations of African-American employees in the surgical department during the relevant time "raise[d] a question in [her] mind as to the fairness of the termination," and (2) Sacker treated Smith fairly and supported Smith's authority when challenged by Caucasian nurses. Smith further explained one of the two other African-American employees Sacker terminated was a "no call, no show," suggesting a non-discriminatory reason for the termination. And Wright did not ask Smith for details regarding the third employee Sacker terminated reportedly for failing to meet expectations. Even if Wright's evidence would somehow permit a reasonable inference of racial discrimination, it certainly did not compel the district

-13-

court to conclude Sacker terminated Wright because of her race. See Williams, 14 F.3d at 1309-10 (concluding a record "devoid of any evidence" that similarly situated comparators were treated differently was insufficient to prove discriminatory motive).

"The district court, sitting as the finder of fact, rejected [Wright's] proof and elected to believe" the testimony of Sacker and Cockrell. Bowen v. Celotex Corp., 292 F.3d 565, 567 (8th Cir. 2002). "The district court was certainly entitled to believe the account given by [hospital] management," over Wright's account. Id. (citing Anderson, 470 U.S. at 574). On cross-examination, Wright admitted making several misrepresentations in her employment history and testified she had "somewhat" of "a history of not being truthful." "[T]he decision to credit the testimony of certain witnesses and not others is virtually never clear error." Bowles v. Osmose Utils. Servs., Inc., 443 F.3d 671, 674 (8th Cir. 2006). "On the record before us, we cannot say that the credibility determinations and findings of fact made by the district court, and upon which it relied in [concluding Sacker fired Wright for non-discriminatory reasons], are clearly erroneous." Willis v. Henderson, 262 F.3d 801, 809 (8th Cir. 2001).

### D.    Disparate Treatment—Terms and Conditions of Employment

Wright also contends the district court's "finding that [Wright] was not subjected to disparate terms and conditions of her employment based on race was clearly erroneous." See 42 U.S.C. §§ 1981, 2000e-2(a)(1) (prohibiting such racial discrimination); Bennett v. Nucor Corp., 656 F.3d 802, 818 (8th Cir. 2011). Asserting she "was placed in a situation where it was not possible for her to perform all of the duties that had been placed upon her," Wright proposes "[t]he testimony demonstrated that [she] was required to perform jobs that similarly situated white employees were not required to perform." Wright again fails to show clear error.

Wright's disparate treatment claim is predicated on the hospital (1) requiring Wright to do alone the work she previously shared with Bell; (2) expecting Wright

-14-

to act "in the capacity" of a supervisor; (3) allowing Caucasian nurses filling in for Wright to perform fewer duties; (4) transferring some of Wright's janitorial duties to the housekeepers after her termination; (5) replacing Wright with two surgical technologists with fewer duties; and (6) refusing Wright's request for a transfer to the day shift, while permitting a Caucasian surgical technologist with family issues to transfer to weekends.

Having carefully reviewed the record, we conclude the district court properly found that Wright failed to adduce sufficient evidence that any difference in the terms and conditions of Wright's employment "was a product of discrimination based on race." See Williams, 14 F.3d at 1310 (holding the trial court did not clearly err in finding insufficient evidence of pretext where "non-discriminatory factors could have accounted for" any difference in treatment). After hearing trial testimony from Wright, Sacker, and others regarding the hospital's staffing practices and performance measures, the district court determined the hospital's profit motive and desire for greater productivity—"pushing work off on Ms. Wright" and "ask[ing] people to do more with less,"—better explained the hospital's allocation of greater responsibility to Wright.

The district court's finding that the challenges Wright faced in her job were related to "the human cost that comes from a large scale business operation"—not to racial discrimination—is supported by substantial evidence and does not leave us "'with the definite and firm conviction that an error was made.'" Urban Hotel, 535 F.3d at 879 (quoting Roemmich, 526 F.3d at 353). "In the absence of any evidence of discriminatory intent, . . . it is not the prerogative of the courts or a jury to sit in judgment of employers' management decisions." Kiel, 169 F.3d at 1136.

## III. CONCLUSION

Because this case does not "fall[] within that narrow class of exceptional cases" in which we overturn the district court's factual findings,[8] LaRoche v. United States, 779 F.2d 1372, 1374 (8th Cir. 1985) (per curiam), we affirm.

_____

[8]We also reject Wright's unsubstantiated allegations the district court was biased and prejudiced as a result of her counsel's prior advocacy. "We have thoroughly examined the record and find absolutely no evidence to support" Wright's bias and prejudice claim—such speculation is both unjustified and unprofessional. Kostelec v. State Farm Fire and Cas. Co., 64 F.3d 1220, 1230 (8th Cir. 1995); see also Souder v. Owens-Corning Fiberglas Corp., 939 F.2d 647, 653 (8th Cir. 1991).